SHARUM v. WHITEHEAD COAL MINING CO.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1915.)

No. 4322.

1. MINES AND MINERALS &approx;68 — MINING LEASE — CONSTRUCTION — NEGATIVE COVENANTS.

Complainant's predecessor in title leased to defendant a tract of land "for the sole purpose of prospecting for and mining coal and asphalt, the party of the second part to occupy so much only of the surface * * * as may be reasonably necessary to carry on the work of prospecting for, mining, storing, and removing such coal and asphalt." The lessee covenanted "to commit no waste upon said premises and to suffer no waste to be committed thereon," and that it would not use said premises "for any other purpose than that authorized in this lease, nor allow them to be used for any other purpose." The consideration for the lease was a royalty upon the products mined. The bill alleged that defendant had sunk shafts upon the premises, from which it had extended tunnels into adjacent lands, from which it was mining large quantities of coal and removing the same through such tunnels and shafts; that it was dumping large quantities of shale and waste brought from such adjacent lands upon the surface of the leased premises, and occupying a large part of such surface with buildings and dwellings for the use of employés engaged in said outside mining operations. Held, that the terms of the lease restricted the use of the leased premises to prospecting for and mining coal and asphalt on such premises, that the law would imply a negative covenant not to use the premises for any other purposes, which covenant might be enforced in equity, and that the bill stated a cause of action for injunctive relief.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 188–191; Dec. Dig. &approx;68.]

2. MINES AND MINERALS &approx;68—MINING LEASES—EQUITY JURISDICTION TO ENFORCE NEGATIVE COVENANTS.

A court of equity may interpose by injunction and indirectly enforce specific performance of negative covenants in mining leases, by preventing the use of the leased premises for purposes inconsistent with that for

which they were demised, where such use would operate to the injury of the lessor, although damages therefor may be recoverable at law.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 188–191; Dec. Dig. ☞68.]

3. EQUITY ☞71—LACHES—SUIT TO ENJOIN VIOLATION OF MINING LEASE.

Delay in commencing suit to prevent the use of premises by a mining lessee contrary to the terms of the lease, while it may affect the question of damages, cannot deprive the lessor of the right to protection against further trespasses.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 204–211; Dec. Dig. ☞71.]

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by A. H. Sharum against the Whitehead Coal Mining Company. Decree for defendant, and complainant appeals. Reversed.

B. B. Wheeler and W. H. Davis, both of Muskogee, Okl. (Ezra Brainerd, Jr., of Muskogee, Okl., on the brief), for appellant.

William M. Matthews, of Okmulgee, Okl., for appellee.

Before HOOK and CARLAND, Circuit Judges, and AMIDON, District Judge.

CARLAND, Circuit Judge. This is an appeal from a judgment dismissing appellant's amended bill on motion. The grounds of the motion are as follows:

"(1) Because said amended bill of complaint sets up a new and independent cause of action from that set up in the original bill of complaint, the said amended bill of complaint having changed the cause of action from a suit to cancel a lease to an injunction enjoining the defendant from committing a trespass.

"(2) Because the complainant has a complete and adequate remedy at law, and this court has no power to grant the relief asked for in said amended bill of complaint.

"(3) Because there is a misjoinder of causes of action.

"(4) Because there is a defect of parties, in that Hugh Henry is not made a party to this suit.

"(5) Because said amended bill of complaint fails to state facts sufficient to constitute a cause of action in favor of complainant and against this defendant."

[1] The bill, after alleging the citizenship of the parties and the amount in controversy, proceeded as follows:

"Fourth. That your complainant is the owner, in fee simple, of the east half (E. ½) of the northwest quarter (N. W. ¼) of section thirteen (13), township eleven (11) north, range twelve (12) east, containing eighty (80) acres of land, more or less, situate in Okmulgee county aforesaid, in the state of Oklahoma; and that your complainant derived title thereto under and by virtue of a certain warranty deed, dated August 21, A. D. 1905, executed by one Hugh Henry, who was, prior to and upon said day and at the time of the execution and delivery of said warranty deed, the owner of said land."

"Sixth. That said warranty deed, as aforesaid, was executed and delivered, for a good and valuable consideration by your complainant to the said Hugh Henry duly paid, and conveyed to your complainant an absolute title in fee simple to said land, subject only to the terms and conditions of a certain coal and asphalt mining lease, so called, bearing date November 19, 1903, and ex-

ecuted and delivered by the said Hugh Henry to the defendant herein. * * * Said coal and asphalt mining lease is in words and figures following, to wit:

## " 'Coal and Asphalt Mining Lease,

## " 'Creek Nation, Indian Territory.

" 'This indenture of lease, made and entered into, in quadruplicate, on this 19th day of November, A. D. 1903, by and between Hugh Henry of Henryetta, Indian Territory, party of the first part, and Whitehead Coal Mining Company, a corporation duly organized and existing under the laws of the territory of Arizona, and duly authorized to carry on business in Indian Territory by compliance with the act of Congress approved February 8, 1901 (31 Stat. 794), of Henryetta, Indian Territory, party of the second part, under and in pursuance of the provisions of section 17 of the act of Congress approved June 30, 1902 [32 Stat. 504, c. 1323], and ratified by the Muskogee or Creek National Council of July 26, 1902, and the rules and regulations prescribed by the Secretary of the Interior relative to mining leases in the Creek Nation, witnesseth: That the party of the first part, for and in consideration of the royalties, covenants, stipulations, and conditions hereinafter contained and hereby agreed to be paid, observed, and performed by the party of the second part, its heirs, executors, administrators, successors, or assigns, do hereby demise, grant, and let unto the party of the second part, its heirs, executors, administrators, successors, or assigns, the following described tract of land lying and being within the Creek Nation and within the Indian Territory, to wit: The south half (S. ½) of the southeast quarter (S. E. ¼) of section twelve (12), and the east half (E. ½) of the northwest quarter (N. W. ¼), less amount occupied as right of way by St. Louis, Oklahoma & Southern Railway, amounting to 8.40 acres, of section thirteen (13), of township eleven (11) north, of range twelve (12) east of the Indian meridian, and containing 151.60 acres, more or less—for the full term of fifteen years from the date hereof, for the sole purpose of prospecting for and mining coal and asphalt; the party of the second part to occupy so much only of the surface of said land as may be reasonably necessary to carry on the work of prospecting for, mining, storing, and removing such coal and asphalt.

" 'In consideration of the premises the party of the second part hereby agrees and binds itself, its heirs, executors, administrators, successors, or assigns, to pay, or cause to be paid, to the party of the first part as royalties the sums of money as follows, to wit: On asphaltum the sum of ten cents per ton for each and every ton of crude asphalt produced, weighing 2,000 pounds, or the sum of sixty cents per ton on refined asphalt. On the production of all coal mined under this lease the sum of eight cents per ton of 2,000 pounds on mine run, or coal as it is taken from the mines, including what is commonly called "slack."

" 'And the party of the second part further agrees and binds itself, its heirs, executors, administrators, successors, or assigns, to pay, or cause to be paid, to the lessor, as advanced annual royalty on this lease, the sums of money as follows, to wit: Fifteen cents per acre per annum, in advance, for the first and second years; thirty cents per acre per annum, in advance for the third and fourth years; and seventy-five cents per acre per annum, in advance, for the fifth and each succeeding year thereafter of the term for which this lease is to run—it being understood and agreed that said sums of money so paid shall be a credit on the stipulated royalties, should the same exceed such sums paid as advanced royalty, and, further, that should the party of the second part neglect or refuse to pay such advanced annual royalty for the period of sixty days after the same becomes due and payable, then this lease shall, at the option of the lessor, be null and void, and all royalties paid in advance shall become the money and property of the lessor. All royalty accruing for any month shall be due and payable on or before the 25th day of the month succeeding.

" 'It is agreed by the parties hereto that the land described herein shall not be held by the party of the second part for speculative purposes, but in good faith for mining the minerals specified, and a failure for one year by the party of the second part to do a reasonable amount of development work or of min-

ing shall be held as a want of compliance with the purposes of this lease and shall render it null and void.

" 'The party of the second part further agrees and binds itself, its heirs, executors, administrators, successors, or assigns, to pay, or cause to be paid, to the party of the first part the royalty as it becomes due. The party of the second part further covenants and agrees to exercise diligence in the conduct of the prospecting and mining operations and to open mines and operate the same in a workmanlike manner and to the fullest possible extent on the leased premises; to commit no waste upon said premises or upon the mines that may be thereon and to suffer no waste to be committed thereon, to take good care of the same and to surrender and return the premises at the expiration of this lease to the party of the first part, or to whomsoever shall be lawfully entitled thereto, in as good condition as when received, ordinary wear and tear in the proper use of the same for the purposes hereinbefore indicated and unavoidable accidents excepted, and not to remove therefrom any buildings or improvements erected thereon during said term by said Whitehead Coal Mining Company, the party of the second part, but said buildings and improvements shall remain a part of said land and become the property of the owner of the land as a part of the consideration for this lease, in addition to the other considerations herein specified, except engines, tools, boilers, boiler houses, and machinery, which shall remain the property of said party of the second part; that it will not permit any nuisance to be maintained on the premises, nor allow any intoxicating liquors to be sold or given away for any purpose on the premises, and that it will not use the premises for any other purpose than that authorized in this lease, nor allow them to be used for any other purpose; that it will not at any time during the term hereby granted assign, transfer, or sublet its estate, interest, or term in said premises and land, or the appurtenances thereto, to any person or persons whomsoever, without the written consent thereto of the party of the first part being first obtained, subject to the approval of the Secretary of the Interior.

" 'And the said party of the second part further covenants and agrees that it will allow said lessor and his agents, from time to time, to enter upon and into all parts of said premises for purposes of inspection, and agree to keep an accurate account of all mining operations, showing the whole amount of mineral mined or removed, and make report thereof promptly, under oath, at the end of each month to the lessor, and to the Secretary of the Interior, through such officer as he may designate, and that all sums due as royalty shall be a lien on all implements, tools, machinery, and other personal chattels used in said prospecting and mining operations, and upon all the mineral obtained from the land herein leased, as security for the payment of said royalties.

" 'And the party of the second part agrees that this indenture of lease shall in all respects be subject to the rules and regulations heretofore or that may hereafter be lawfully prescribed by the Secretary of the Interior relative to such mineral leases in the Creek Nation; and said party of the second part expressly agrees that should it, its sublessees, its heirs, executors, administrators, successors, or assigns, violate any of the covenants, stipulations, or provisions of this lease, or fail, for the period of sixty days, to pay the stipulated monthly royalty provided for herein, then the party of first part shall be at liberty, in his discretion, to avoid this indenture of lease and cause the same to be annulled, when all the rights, franchises, and privileges of the party of the second part, its sublessees, executors, administrators, successors, or assigns, hereunder shall cease and end without further proceedings. If the lessee makes reasonable and bona fide effort to find and mine coal and asphalt in paying quantity, as herein required of it, and such effort is unsuccessful, it may at any time thereafter, with the approval of the Secretary of the Interior, surrender and wholly terminate this lease upon the full payment and performance of all its then existing obligations hereunder: Provided, however, that approval of such surrender by the Secretary will be required only during the time his approval of the alienation of the land is required by law.

" 'It is further agreed and understood that this lease shall be of no force or effect unless the party of the second part shall, within sixty days from the date of approval of the application filed in connection herewith, furnish a

·satisfactory bond in accordance with the regulations of July 10, 1903, prescribed by the Secretary of the Interior. * * * That this plaintiff, by said purchase, has secured for himself all the rights, privileges, and remunerations heretofore possessed, owned, and held by said Hugh Henry under and by virtue of the terms of said lease.' "

"Ninth. That the defendant, acting under and by virtue of the authority and license of said coal and asphalt mining lease, has entered upon said land .so as aforesaid owned by your complainant, and has thereon sunk shafts, excavated underground passages and corridors, erected hoists, shaft houses, engine and boiler houses, and has constructed upon the surface of said demised premises railroad tracks, ponds for the storage of water, storage bins, and buildings suitable and proper for use in connection with the business of prospecting for, mining, removing, storing, and shipping coal, and has constructed and erected upon the surface of the premises so owned by your complainant large numbers of houses and dwellings to be rented, used, occupied, and inhabited by its employés and workmen employed by it in its business of prospecting for, mining, and shipping coal as aforesaid, and that said defendant is still maintaining and operating on said premises of your complainant said shafts, passages, corridors, hoists, engine and boiler houses, railroad tracks, ponds, storage bins, buildings, and dwelling houses, and said constructions and erections, so as aforesaid enumerated and described, occupy and cover a large portion of the surface of said land so owned by your complainant."

"Fifteenth. That said defendant, claiming and asserting its right so to do under said lease, has extended its openings, passageways, and corridors from the shaft sunk on your complainant's premises under your complainant's land, and into and under the surface of other lands not described in nor mentioned in said lease, and owned by divers persons, firms, and corporations, whose names are to your complainant at present unknown, but in and to which your complainant is informed and believes, and therefore so avers, the defendant has acquired some interest.

"Sixteenth. That said defendant is now engaged, and for· a long time hitherto has been engaged, in mining, removing, and shipping coal located un-·der the surface of the lands adjacent to your complainant's lands, and for the purpose of removing, mining, and shipping said coal so located under the surface of lands not owned by your complainant, and not included in nor mentioned in said lease, the said defendant has, during all said time, the exact period of which is to your complainant unknown, but wholly within the knowledge of the defendant, been and still is using, employing, and occupying the corridors, passageways, and shafts located in and under your complainant's land, and has been during all said time and still is using and employing the various buildings, erections, structures, ponds, and railroad tracks hereinbefore enumerated as having been erected upon the surface of your complainant's land under said lease for the mining and removal of coal located on adjacent tracts of land not owned by your complainant and not mentioned in said lease.

"Seventeenth. That said defendant, during all said time, has been and still is using and employing the surface of the ground owned by your complainant, .as aforesaid, for the purpose of dumping thereon shale, rock, and other waste materials, removed from under said adjacent lands, and has deposited and still is depositing and dumping on the surface of your complainant's land large quantities of rock, shale, and other waste material taken from and originally located under the surface of said lands adjacent to the lands mentioned in said lease, and during all said time has and still is renting to, leasing to, and otherwise permitting and causing the houses erected on the surface of your complainant's land, as well as the surface lands of your orator adjacent thereto, to be used and occupied by its employés, who are engaged in mining and removing coal from under the lands located adjacent to the lands mentioned in this lease, and from under lands not mentioned in nor in-·cluded in said coal and asphalt mining lease.

"And your complainant further avers that the said defendant, using for that purpose the aforesaid shafts, corridors, and passageways located in and ·under your complainant's premises, as aforesaid, and using for that purpose

the shaft houses, hoists, engine and boiler houses, railroad tracks, ponds, storage bins, buildings, and dwelling houses, and using for that purpose a large portion of the surface of your complainant's premises, has mined and removed from under the surface of the premises adjacent to your complainant's said land, and from under the surface of lands not mentioned in said lease, a large quantity of coal, the exact amount of which, by reason of the false and fraudulent statements, concealments, and misrepresentations of the defendant, as aforesaid, your complainant is unable to state, but which is fully known to the defendant, and which exceeds, as your complainant is informed and believes, and therefore so avers, one hundred and twenty thousand tons of two thousand pounds each.

"Your complainant further shows that it was a condition of said coal and asphalt mining lease that said defendant should exercise diligence in the prospecting and mining operations to be ·conducted thereunder, and should open mines and operate the same to the fullest possible extent on said leased premises; that said defendant has largely abandoned the operation of mines by it opened on said leased premises, so far as the·same applies to the removal of coal located within the boundary line of said leased premises, and is largely engaged in the removal through the mines so opened on your complainant's premises, and through the corridors, shafts, and passageways thereof, and with the aid of the structures, buildings, hoists, shafts, railroad tracks, and other appliances located on the surface of your complainant's land, of large quantities of coal located outside the boundary line of said leased land, and located in and under lands not owned by your complainant and not described in said lease.

"That there now exists in the coal veins and mines underlying the premises owned by your complainant, as aforesaid, large quantities of coal not yet mined and suitable to be mined under said lease, and that said defendant has been for a long space of time, the exact length of time being to your complainant unknown and wholly within the knowledge of the defendant, and still is, largely engaged as hereinbefore set forth in removing and mining coal located under lands not included in said lease, to the neglect of like mining operations which ought to, and otherwise might, have been carried on in and under the lands of your complainant and in and under the lands described in said coal and asphalt mining lease.

"That said defendant claims and insists that under said coal and asphalt mining lease it has the right and is lawfully entitled to proceed as hereinbefore set forth and to use the shafts, passageways, and corridors of the mines opened upon, in and under your complainant's said land, and to use the shaft houses, engine and boiler houses, railroad tracks, storage ponds, and storage bins located on the surface of your complainant's land for the mining and shipping of coal taken from under lands not owned by your complainant, and not mentioned nor described in said lease, and to use, occupy, and employ the houses and the grounds of your complainant adjacent thereto as habitations and dwellings for its servants and employés engaged in the mining and shipping of coal taken from under lands not mentioned in nor described in said lease, and that said defendant claims and insists that it has the right and is lawfully entitled to use the surface of your complainant's land for the purpose of depositing and dumping thereon rock, shale, and other waste material removed from under said lands adjacent to the lands mentioned in said lease, and not being the, or any of the, lands described therein.

"That said defendant, notwithstanding it insists and claims a right under said coal and asphalt mining lease to engage in said mining operations for the removal of coal from under the lands adjacent to your complainant's land, but not mentioned in said lease, to the neglect of mining operations which might otherwise have been conducted in accordance with said lease within the lands of your complainant, and notwithstanding it has, at all times, insisted and still insists, upon using, engaging, and employing, and at all times has used, engaged, and employed, the shafts, corridors, and passageways of the mines opened in your complainant's land and the shaft houses, engine and boiler houses, storage ponds, and storage bins, railroad tracks, and dwelling houses erected upon the surface of the ground thereof, as well as large portions of the surface of your complainant's land, in and to all of which said defendant

has no right, title, interest, license, or easement, except such as it granted and conveyed by said coal and asphalt mining lease, for the purpose of mining and shipping coal which said defendant is taking and removing from and under said adjacent lands, and not from and under any of the lands described in said lease, and claims and insists that all said operations, as aforesaid, are authorized and permitted by, and are within the intent and purpose of, said coal and asphalt mining lease, yet said defendant has hitherto wholly failed and refused, and still fails and refuses, to account to the complainant on account of any of said operations conducted outside, or in part outside, the boundaries of said lands of your complainant, and refuses to pay to or to account to your complainant for the stipulated royalty of eight cents for each and every ton of coal of two thousand pounds so mined, but, on the contrary, threatens to continue and still does continue to prosecute and conduct said mining operations for the removal·of coal located outside said land described in said coal and asphalt mining lease, and to use the mines of and in your complainant's land, and the shafts, corridors, and passageways thereof, as well as the surface of your complainant's land and the shaft houses, engine and boiler houses, storage ponds, storage bins, railroad tracks, dwelling houses, and other appliances erected thereon for the mining and shipping of coal located and taken from under land not mentioned in said lease without accounting or paying to your complainant any compensation therefor."

There were other allegations in the bill bearing upon the prayer for an accounting, which we omit. In the view we take of the facts alleged in the bill, appellant is not entitled to an accounting for coal mined on adjacent lands not included within the lease. The bill, however, contained a prayer for alternative relief in the following language:

"And your complainant further prays that if upon hearing your honorable court shall consider that the complainant is not entitled to the relief hereinbefore specifically prayed for, that in that event your honorable court will cause to be made and entered its decree perpetually restraining and enjoining the defendant, its successors and assigns, and its and their agents, servants, and employés, from further employing or making use of the shafts, corridors, and passageways in and under the lands of your complainant and the surface of the ground thereof, as well as each and all and any of the shaft houses, engine and boiler houses, storage ponds, and storage bins, railroad tracks, dwellings, and other structures erected or situated upon the premises of your complainant for the mining, removal, storage, or shipping of any coal or asphalt originally located, taken, or removed from, in, or under lands not mentioned or described in said coal and asphalt mining lease, and that said defendant, its successors and assigns, and its and their servants, agents, and employés, be by said decree likewise perpetually restrained and enjoined from dumping or depositing upon the surface of your complainant's land aforesaid any rock, shale, or other waste material removed from or taken from, in or under any lands not described in said coal and asphalt mining lease, and that they be, each of them, perpetually restrained and enjoined from passing in, over, through, or upon your complainant's land aforesaid for the purpose of prospecting, mining, or removing, or transporting in, through, or over your complainant's land any coal or asphalt originally discovered, found, located, or taken from, in, or under any lands located outside the boundary lines of the land described in said coal and asphalt mining lease, and from removing or conveying in, over, or through the lands of your complainant, or in or through the corridors, passageways, or shafts thereof, or over the surface thereof, any coal or asphalt not taken or located by nature within the lands described in said coal and asphalt mining lease."

We are of the opinion that the facts appearing in the bill as above detailed constituted a good cause of action and warranted the relief prayed for in the alternative prayer of the bill. The language of the lease is:

"Do hereby demise, grant and let  *  *  *  for the sole purpose of prospecting for and mining coal and asphalt; the party of the second part to occupy so much only of the surface of said land as may be reasonably necessary to carry on the work of prospecting for mining, storing and removing such coal and asphalt.  *  *  *"  The lessee agreed "to commit no waste upon said premises and to suffer no waste to be committed thereon,  *  *  *  and that defendant will not use the premises for any other purpose than that authorized in this lease, nor allow them to be used for any other purpose."

The lease did not become valid until approved by the Secretary of the Interior, and it was at all times subject to his rules and regulations relative to mineral leases in the Creek Nation. It does not seem reasonable that the Secretary of the Interior would approve a lease which, properly construed, would permit a lessee to use the premises as a dumping ground for shale and other waste taken from mines upon other premises than those described in the lease. If the lease shall receive the construction contended for by appellee, then, there is no limit as to the use to which the premises may be put with reference to the mining of coal and asphalt upon adjacent land not included within the lease. If the lessee is entitled to use the shafts, tunnels, and surface of the land in connection with mining operations upon land adjacent to the land described in the lease, then the lessee may use it in connection with mining operations in land not adjacent. We ought not to permit a construction to be given to the lease which would allow the lessee to ruin the surface of the leased premises by dumping shale and waste from mining operations carried on in land not mentioned in the lease. It is plain, we think, that the use of the premises leased was restricted by the express terms of the lease to prospecting for and mining coal and asphalt on the premises leased. This view is sustained by the fact that the consideration for the lease was to be paid in royalties upon the coal and asphalt mined and an advance royalty at so much per acre on the land leased. As appellant is not entitled to royalties on coal and asphalt mined from adjacent land, the consideration for the lease would fail if the construction contended for by appellee should prevail. This being so, the law will imply a negative covenant not to use the premises for any other purposes than those specified; and a court of equity will protect the lessor or the appellant in this case against a violation of the negative covenant.

[2] It is also well settled that a landlord is not confined to his remedy at law by an action for damages. Kraft v. Welch, 112 Iowa, 695, 84 N. W. 908; Steward v. Winters, 4 Sandf. Ch. (N. Y.) 587; Taylor, Land. & Ten. § 691; 2 McAdam, Land. & Ten. (3d Ed.) 1429; De Wilton v. Saxon, 6 Ves. 106; Moore v. Price, 125 Iowa, 353, 101 N. W. 91. Although no damages are shown growing out of improper use of entries, an injunction will be granted. Thos. Beck & Sons v. Economy Coal Co., 149 Iowa, 24, 127 N. W. 1109; Peters v. Philipps, 63 Iowa, 550, 19 N. W. 662; Robbins v. Archer, 147 Iowa, 743, 126 N. W. 936; State Security Bank v. Hoskins, 130 Iowa, 339, 106 N. W. 764, 8 L. R. A. (N. S.) 376; Lemmon v. Guthrie Center, 113 Iowa, 36, 84 N. W. 986, 86 Am. St. Rep. 361. In Schobert v. Pittsburgh Coal & Mining Co., 254 Ill. 474, 98 N. E. 945, 40 L. R. A. (N. S.) 826, Ann. Cas. 1913B, 1104, it was decided that courts of equity will frequently interpose by injunction and indirectly enforce specific performance

of purely negative covenants annexed to or contained in contracts or leases by prohibiting their breach, and will entertain bills for injunction to prevent their breach, although a violation of the covenants will occasion no substantial injury, and although the damages, if any, be recoverable at law. In Consolidated Coal Co. of St. Louis v. Mary Ann Schmisseur, 135 Ill. 371, 25 N. E. 795, it was decided that where a contract of leasing is certain, and the use of the demised premises for a specified purpose is clearly fixed by the agreement of, the parties, the appropriation of the premises to a use inconsistent with that for which they are demised will afford ground for the interposition of a court of equity by way of injunction where the change will operate to the injury of the lessor.

In Brasfield v. Burnwell Coal Co., 180 Ala. 185, 60 South. 382, it was decided by the Supreme Court of Alabama that the execution of a lease to mine coal under lands will not authorize the lessee to dump slate and refuse upon the surface of the land unless the right is expressly granted, and that where a mining lease did not authorize the lessee to use openings and apertures on the demised land to mine adjacent property not belonging to the lessor, the use of the openings for that purpose will be enjoined, as the lessee took no right except under the lease and the failure of the lease to grant that privilege impliedly negatives the privilege, thus raising an implied negative covenant which in analogy to specific performance will be enforced by injunction. It must be borne in mind that this case does not involve the absolute sale of mineral lying under the land. In Lillibridge v. Lackawanna Coal Co., 143 Pa. 293, 22 Atl. 1035, 13 L. R. A. 627, 24 Am. St. Rep. 544, it was decided that, where there has been an absolute sale of the mineral lying under land and a severance of the estate in the mineral from the estate in the surface, the title thus obtained by the owner of the mineral is an estate in fee which terminated when the mine had been exhausted, and that where there are no restrictions in the grant, reservation, or exception which creates the estate, the space which may be left by the removal of the mineral, and by the removal of so much of the containing strata as may be reasonably required for the operation of mining, remains a part of the property of the miner only until the exhaustion of the mine and may be used by him during the continuance of the estate as he may see fit, provided that such user does no injury to the surface, and this includes the right to haul mineral and turn water through such space from other mines. To the same effect are Webber v. Vogel, 189 Pa. 156, 42 Atl. 4; Moore v. Indian Camp Coal Co., 75 Ohio St. 493, 80 N. E. 6; Consolidated Coal Co. of St. Louis v. Schmisseur, supra; Schobert v. Pittsburgh Coal Co., supra.

[3] It will be noticed that in each case where an injunction was refused in the case of the absolute sale of mineral it appeared there was no injury to the surface. We have no doubt that the appellant is entitled under the facts stated in his bill to the alternative relief prayed for. We are also of the opinion that there was no abuse of discretion by the trial court in allowing the amended bill to be filed; that there is not a misjoinder of causes of action, nor a defect of parties. It is contended by counsel for appellee that appellant has acquiesced in

the conduct of appellee of which he complains for almost 10 years, during which time extensive improvements have been made, and this delay ought to preclude him from obtaining equitable relief. It does not appear by the bill as to how long appellant has known of the use being made of the premises in question contrary to the terms of the lease, but delay, while it might affect the question of damages, cannot interfere with the right of appellant to prevent further trespass. Matulys v. Philadelphia & Reading Coal & Iron Co., 201 Pa. 70, 50 Atl. 823.

Counsel for appellee also urges upon us the proposition that although the appellee is not entitled to use the shaft and entries for the purpose of removing coal from adjoining land, nevertheless, if the issuance of an injunction would cause great injury to the appellee and little benefit to the appellant, it would be the duty of the court to refuse that form of equitable relief. There is no question about the right and duty of a court of equity in issuing injunctions to take into consideration the comparative injury of the different parties to the suit. This court, however, is now considering an appeal from the judgment of the court below dismissing the bill on motion. We simply decide that there is an equitable cause of action stated in the bill. All that we may do in pursuance of our decision is to reverse the judgment below, with instructions to overrule the motion to dismiss and to allow the appellee to answer the bill, if it shall be so advised. If appellant shall finally prevail upon the merits, or if, prior to final hearing, application is made for a temporary injunction, the court below has full power to deal with the question of issuing an injunction upon the facts as they then may appear. We are simply deciding the case upon the facts stated in the bill. If upon application for a temporary injunction, or upon final hearing a case is made for injunction in accordance with the views of this court, the trial court will have full power as a court of chancery to act as law and justice may require, and may, if it shall be deemed proper, withhold the injunction upon the execution of a bond with surety by appellee conditioned to pay all damages arising from the unlawful acts of appellee in the past or which may be caused in the future up to the time of the expiration of the lease.

The judgment below is reversed, and the case remanded, with instructions to overrule the motion to dismiss and to allow appellee to answer the bill within a time to be named, if it shall be so advised, and to otherwise proceed with the case as law and justice may require, not inconsistent with the views herein expressed.