## PERCY LA SALLE MINING & POWER CO. v. NEWMAN MINING, MILLING & LEASING CO.

(District Court, D. Colorado.   June 15, 1924.)

No. 7080.

1. **Mines and minerals** ⊙⊃68(1)—**Mining lease does not carry right to mine by "outstroke."**

A mining lease conveys title to no property, but only an incorporeal right to search for and extract mineral from the leased property, which does not include the right to mine by "outstroke," or taking out mineral from adjoining property through the tunnels and shafts of the demised premises, unless expressly covenanted for.

2. **Mines and minerals** ⊙⊃52—**Injunction may be granted to enforce negative covenant of mining lease.**

In a mining lease granted in consideration of royalties, there is an implied negative covenant that the property shall be used only for the purposes for which it is demised, which may be enforced by injunction restraining the lessee from using the tunnels and shaft as a way for removal of ore mined from adjoining property.

In Equity.   Suit by the Percy La Salle Mining & Power Company against the Newman Mining, Milling & Leasing Company.   On motion to dismiss bill.   Denied.

James Grafton Rogers, of Denver, Colo., for plaintiff.
Robert G. Bosworth, of Denver, Colo., for defendant.

SYMES, District Judge.   This matter is before the court on defendant's motion to dismiss.   The bill sets out that the plaintiff was the owner in fee of a group of mining claims situated in Pitkin county, Colo., and that by a certain lease or written agreement between it, as lessor, and the defendant, as lessee, it leased the said mining claims to the defendant for a term of 10 years, beginning June 1, 1917, in consideration of the royalties, covenants, etc., set forth therein.   Copy of lease is annexed to the bill.

It then charges that lessee took possession of the property, and has ever since continued and prosecuted mining operations thereupon, consisting of the sinking of shafts, excavating underground workings, etc., and installing hoists, mining machinery and other improvements upon the surface.   Next, that the defendant has from time to time acquired by purchase or lease mining claims and properties adjacent and contiguous to the premises leased, and that the defendant—

"claiming and asserting its right so to do under said agreement * * * has so opened up and extended the workings, openings, tunnels, passageways, and corridors from the shaft or shafts sunk upon the plaintiff's demised property, under the plaintiff's said lands and into and under the surface of the said other mining claims and properties which are adjacent or contiguous to the properties of the plaintiff aforesaid, and which are not part of the said demised premises nor described or mentioned in said agreement or indenture of lease," and further, "for some time hitherto has been engaged in mining, removing, and shipping ores and minerals located and extracted under and from the surface of the said mining claims adjacent or contiguous to the plaintiff's said properties," and for the purpose of so mining and shipping

⊙⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

said ores· from claims other than those owned by the plaintiff "has been and still is using, employing, and occupying the workings, tunnels, passageways, shafts, and other facilities located in, upon, and under the plaintiff's lands, and also by the use of the machinery, apparatus, and appliances constructed and situate upon the plaintiff's said premises," in violation of the terms of the lease.

[1] This statement squarely presents a question that does not appear to have been decided in respect to metalliferous mining. To discuss the matter more intelligently the terms of the lease will be referred to so far as they are pertinent. It is the usual form of mining lease, and the lessee in paragraph 1 covenants to immediately enter upon the property and begin and continue work, reopening and repairing the tunnel into the old workings therein, and doing other underground work "in manner necessary to reach and take out the greatest amount of ore possible, with due regard to the operation and development of the premises as a workable mine." Paragraph 2 provides for a deposit in the bank to the credit of the lessee of a sum of $25,000, the use of which should be restricted to the payment of the underground work provided for above. Paragraph 7 provides for a royalty to be paid to the lessor of 15 per cent. of the net smelter or mill value on all ore shipped or sold from the premises during the term of the lease. Other usual covenants are incorporated, but it is not necessary to mention them, except the final one, which is that upon the termination of the lease the lessee agrees to deliver the premises, with all structures erected thereon, and fixed machinery placed therein, in good order and condition, with the mine ready for immediate and continuous working, so far as the same shall have been opened or reopened.

What does a mining lease vest in the lessee? Providence Mining & Milling Co. v. Nicholson, 178 Fed. 29, 101 C. C. A. 157, held that a mining lease conveys nothing but a right to search for and extract the minerals, and that the lessee acquired no other rights, and that the title in all other respects remained in the lessor. See, also, Butler v. McGorrisk et al., 114 Fed. 300, 52 C. C. A. 212. In Ewert v. Robinson et al. (C. C. A.) 289 Fed. 740, Judge Kenyon's review of the authorities construing leases shows that in the Western states, at least, in the absence of an expressed covenant, the ordinary oil or mining lease conveys no title to the mineral in place. Further, the Supreme Court held in United States v. Biwabik Mining Co., 247 U. S. 116, 38 Sup. Ct. 462, 62 L. Ed. 1017, that a mining lease was not to be construed as a conveyance of ore in place, in spite of the fact that the latter could be measured with substantial accuracy. In other words, it grants merely an incorporeal hereditament or easement, and not an estate in fee.

What the lessee contends for here is the right to mine by "outstroke," which means the raising or removal of ore from a mine adjoining the demised premises through a shaft or opening on the latter. In White on Mines and Mining Remedies (an English work) § 126, after defining "instroke" as being the right to raise or take ore from a leased mine through the shaft or tunnel of an adjoining mine, and defining "outstroke" substantially as above, the author says:

"A lessee has by implication the right to work by instroke, and can exercise such right without an express stipulation in the lease to that effect, although he cannot work by outstroke without the express consent of the lessor, or covenant in the lease giving him such right. The right does not exist in the lessee by implication, but must be specially covenanted for before it can be rightfully exercised, for, though the lease of a mine carries with it to the lessee the right to use the space or chamber from which the ore is contained, the right extends only to the minerals demised, and would not authorize the lessee to use the same for the conveyance of minerals from any other mine, and such use would entitle the lessor to collect a way lease rent by way of compensation for the exercise of the privilege."

In Stewart on Mines and Mining (1894), also published in England, it is held (pages 115, 116), that the right to mine by instroke goes to lessee by implication; but the right to mine by outstroke is excluded, except where specifically covenanted for in the lease, because—

"In outstroke working, on the other hand, the lessee makes use of lessor's mine for a purpose not implied in the lease. Such a right cannot be inferred."

Barringer & Adams, Mines and Mining (1897) p. 578, says:

"On the other hand, surface rights and the incidental rights, such as that to use shafts, whether expressed or left to implication, may be used for the purpose only of mining under the particular premises conveyed, and not as a means of removing minerals from other lands."

And on page 584, under "Rights of Way," it is said:

"Rights of way annexed to rights to mine, or granted for the purpose of removing and transporting minerals from and materials to the mine, may not be used for other purposes, as for general railroad purposes; nor, in the absence of expressed provision, can they be used for the transportation of minerals from other mines. And consequently the owner of the mineral, with the privilege of a right of way, may not give to others the right for general or other purposes of transportation."

And further, on page 585:

"Where adjoining mines are in the same possession, and it is convenient to work one of them through a shaft or pit made for the other, the right to do so does not exist, in the absence of express power. The owner of the fee may prevent the use of his land in connection with the working of other mines."

In the English text-book, McSwinney on Mines (5th Ed.) § 443 et seq., the author says that the lessee of a mine is entitled prima facie to work the minerals by "instroke." On the question of "outstroke" the contrary view is expressed:

"In some cases, where the right of outstroke or of underground carriage is claimed, the position seems clear. When the lessee of a mine is also the lessee of the shaft and the nonmineral strata, but is not the lessee of the surface, he is not, whatever his rights with respect to the shaft and the nonmineral strata, entitled prima facie to carry foreign minerals from the pit's mouth across the surface. And when he is not the lessee of the nonmineral strata, but has driven roads therein for the purpose of working the demised mine, he is not entitled, prima facie, to use such roads for carrying foreign minerals underground. And the lessee of a mine is not, in that character only, the lessee of the space or vacuum which his workings create, the immediate property in such space or vacuum being in or reverting to the lessor.

"As regards outstroke, however, the lessee of a mine may be also the lessee of the land generally, including therefore the surface, the shaft, and the nonmineral strata. And as regards underground carriage, he may be also the lessee of the nonmineral strata; and in each of these cases the question

arises: What is his position? To answer this question, regard must [it is submitted] be had to the position of a lessee as contrasted with that of a freeholder. When a lease is granted for a specified purpose, the lessee cannot, prima facie, use the demised property for another purpose. On the other hand, in cases of waste a lessee is not guilty, if he uses the property for a purpose for which it was intended to be used. The question therefore [it is submitted] is: Was it within the probable contemplation of the parties that the lessee should have the right of outstroke or underground carriage? The burden would [it is submitted] be upon him to show that it was. If a lessee carries foreign minerals without having the right to do so, the lessor may obtain compensation by way of wayleave rent."

An interesting English case on this question is that of Ramsey v. Blair, 1 Law Reports, Appeal Cases, 701. Blair sued Ramsey et al. to prevent them from carrying their coal works under Mr. Blair's lands, which had come to him at different periods from the Ramsey family as superiors thereof. The defense was that in the grants to Blair there were reservations which entitled them (Ramsey et al.), not only to work the coal under Mr. Blair's lands, but also to make and use passages through it for the transmission of coals lying outside and beyond its boundaries. Blair had three distinct grants and contiguous parcels, with reservations of the coal underneath in different terms. Two of the grants were similar in terms, and did not specifically mention "outstroke" mining. Lord Chelmsford said (page 702):

"With regard to those grants there can be no doubt at all that the only reservation is of the coal under the surface, and the grantor would have no power whatever to carry under those lands any coals or minerals won and worked from other lands."

And Lord Hatherley (page 704):

"Now the right which has been reserved in this case is only a right to the coals under the lands which have been parted with—that is to say, a right to the portion of the coal situated under the surface demised to the respondent—and nothing can be done beyond the purpose of working the coal under the respondent's land, and no other coal."

Other English cases, where the question is quaintly and interestingly discussed and the right denied, in the absence of an expressed covenant, are Midgley v. Richardson, Meeson & Welsby Reports, 2 Exchequer, 595, and Durham & Sutherland Ry. Co. v. Walker, 2 Gale & Davidson's Reports, 326.

Defendant cites two English cases, to wit, Jegon v. Vivian, 6 L. R. Ch. Appeal Cases, 742, and Lewis v. Fothergill, 5 L. R. Ch. Appeal Cases, 103. Jegon v. Vivian involved only the question of instroke, and the lease was a demise of the coal, and not of the surface. What the lessor really sought was to compel the lessee to sink a pit on the lessor's property to reach the workings on the latter property that the lessee had opened up and developed from his adjoining property. The lessor relied on a provision in the lease that the estate shall, at the expiration thereof, be delivered back, and so that the work might be continued. The Lord Chancellor held against him.

Lewis v. Fothergill is not in point, because there the lessor leased to the owners of the adjoining property, who proceeded to work the property by instroke, or headings, from the adjoining property. The

lessor, like in the case above, sought to compel the lessee to sink a shaft on the demised property at great expense. The Chancellor stated that the agreement contemplated communication between the two mines, and that the lessor was, in effect, asking the lessees to spend £30,000 for purposes about which nothing was said in the lease.

[2] In Sharum v. Whitehead Coal Mining Co., 223 Fed. 282, 138 C. C. A. 524, a decision by our Circuit Court of Appeals, it was held that a court of equity may interpose by injunction, and indirectly enforce specific performance of negative covenants in mining leases, by preventing the use of leased premises for purposes inconsistent with that for which they were demised. The lease in this case was for the sole purpose of mining coal and asphalt, and contained a covenant against waste. Consideration for the lease, like in the instant case, was a royalty upon the products mined, and the lessor complained that his property was being used to mine coal from adjacent property. The court held that the use of the premises was restricted by the lease to prospecting for and the mining of coal and asphalt on the premises leased, because the consideration was to be paid in royalties upon the product mined, and would fail if adjoining premises were allowed to be worked through the demised premises, because the lessor was not entitled to royalties on the product of the adjoining lands.

The court distinguishes Consolidated Coal Co. v. Schmisseur, 135 Ill. 371, 25 N. E. 795, and Moore v. Indian Camp Coal Co., 75 Ohio St. 493, 80 N. E. 6, on the ground that in those cases there was an absolute sale of mineral, and cites with approval Brasfield v. Burnwell Coal Co., 180 Ala. 185, 60 South. 382, which held that, where a mining lease did not authorize the lessee to use openings on the demised land to mine adjacent property not belonging to the lessor, the use of the openings for that purpose will be enjoined, as the lessee took no right except under the lease, and the failure of the lease to grant that privilege impliedly negatives the privilege, thus raising an implied negative covenant, which in analogy to specific performance will be enforced by injunction. This case was distinguished by the same court in Bagley v. Republic Iron & Steel Co., 193 Ala. 219, 69 South. 17, but not overruled.

In Snell v. Wasatch Valley R. R. Co., 3 Utah, 192, 2 Pac. 193, the owner of a piece of land granted a right to take stone therefrom, together with a right of way to and from the quarry. The railroad company attempted to claim the right to operate a railroad over the right of way by reason thereof. The court held the right of way was limited to the right to quarry, and the plaintiff retained possession against all but the grantee, because the fee to the soil remained in him. See, also, Moore v. Price, 125 Iowa, 353, 101 N. W. 91.

There are authorities that seemingly hold to the contrary, but they are cases of absolute sale and conveyance of the coal in place, and a severance of the estate in the mineral from the estate in the surface, thus creating a separate estate in the lessee. For instance, in Consolidated Coal v. Schmisseur, supra, complainant had made an absolute sale of the coal underlying their land for a fixed sum, to wit, twenty-two thousand odd dollars, and in addition leased for 35 years, unless the

coal should be sooner exhausted, 11 acres of the surface. The lessees went into possession, sunk shafts, took out coal, and were removing coal through entries and openings in complainant's land (from the adjoining land). The court refused an injunction, because it could find no violation of the lease, for the reason that the 35 years had not expired, nor had all the coal been exhausted, and the grantees had the whole 35 years to mine and remove the coal. The court, however, recognized this general proposition:

"Where a contract of leasing is certain, and the use of the demised premises for a specified purpose is clearly fixed by the agreement of parties, the appropriation of the premises to a use inconsistent with that for which they were demised will frequently afford ground for the interposition of a court of equity by way of injunction. And it is well settled that, whenever the use to which premises are sought to be appropriated is inconsistent with the purposes for which they were let, and the change will operate to the injury of the lessor, the aid of such court may properly be invoked. In respect to purely negative covenants annexed to or contained in contracts or leases, courts of equity will frequently interpose by injunction, and indirectly enforce specific performance of such negative covenants by prohibiting their breach."

In Lillibridge v. Coal Co., 143 Pa. 293, 22 Atl. 1035, 13 L. R. A. 627, 24 Am. St. Rep. 544, it was complained that the owner of the mineral was removing coal from the adjoining land owned by him on the north, through a tunnel on the complainant's land, to other land adjoining owned by him. It was conceded that the agreement between the parties constituted an absolute sale to the defendant of all the coal underlying the tract of land in question, and that the surface and the minerals may become separate tenements. The court cites authorities to the effect that in Pennsylvania the mineral is a corporeal and not an incorporeal hereditament, and that the surface may be held in fee by one person and the mineral in fee by another person, and, in short, the ownership of mineral, when severed from the surface, has all the attributes of ownership of land. So it necessarily resulted, as the court said, that:

"It follows, hence, that the tunnel or way is exclusively within the defendant's own property, and is subject to such use as any owner may desire of property belonging to himself."

Likewise, in Moore v. Indian Camp Coal Co., 75 Ohio St. 493, 80 N. E. 6, the same rule was applied, and the court held that it was not a question of easements, which is a right or burden in or upon or over the estate of another, but rather the right of a lessee to use their own property as a way for transporting coal mined on adjoining estates.

Schobert v. Pittsburg Coal & Mining Co., 254 Ill. 474, 98 N. E. 945, 40 L. R. A. (N. S.) 826, Ann. Cas. 1913B, 1104, is not in point, because the court says:

"We think the sufficiency of this bill must be determined from a consideration of the legal effect of a conveyance of coal under the surface of land, without any reference to the allegations that, at and prior to the time of the conveyance from Ammel to Gundlach, it was understood and agreed in writing between them that nothing passed by the grant except the coal and the right to remove it, and that, when removed, the rooms, entries, and tunnels should revert to the grantor and his assigns. If there was such a writing, it is not

set out in the bill nor made an exhibit to it, nor is it alleged that it was contemporaneous with the execution of the deed, but the allegation is that the writing existed prior to and at the time the deed was made. Neither is there any allegation that such a writing was recorded, or that Fournie had notice of its existence when he bought the acre of coal from Gundlach."

These authorities, both English and American, with the exception noted, hold that, when the lessee merely takes a right to search for and remove minerals expiring on a day certain, he has, in the absence of expressed grant, no right to use the premises for purposes of mining other properties, and, if he makes such unauthorized use of the leased premises, he may be restrained by injunction. The reason for this rule, apparent in most of the cases, especially the English ones, is that, if the lease confers no authority to so use the premsies, none exists, because the lease is the sole warrant to use the premises for any purpose whatsoever. Further, the right to mine by outstroke will not be inferred, because, as in the instant case, the right sought by the 'lessee is to impose an additional burden on the property without compensation, as distinguished from the case of instroke mining, which might be classed as a benefit.

This reasoning is more compelling when applied to metalliferous mining than to the facts of the cases out of which it grew. The discovery of minerals on the lessor's premises—the existence of which is most uncertain—and the development thereof is as much the object of the lessor as the royalties received. This purpose is defeated if the lessee is allowed to use the demised premises simply as a highway to adjoining property, where the minerals may be of greater value. It would impose additional burdens on the property in the way of shafts, tunnels, machinery, and dumps more extensive than the mining of the demised premises alone requires. And, finally, the amount of royalty received by the lessor would be lessened, instead of increased.

The motion to dismiss the bill is denied.