STANDARD OIL COMPANY OF LOUISIANA *v.* OIL WELL SAL-
VAGE COMPANY.

Opinion delivered January 18, 1926.

1. MINES AND MINERALS—RECOVERY OF ESCAPING OIL.—Oil which, against defendant's will, escaped from its pipe line and found its way into plaintiff's pick-up station may be recovered by defendant.

2. MINES AND MINERALS—CONSTRUCTION OF LEASE.—An oil and gas lease conveys not merely a license but an interest and easement in the land itself.

3. MINES AND MINERALS—CONSTRUCTION OF SURFACE LEASE.—Where the owner of land executed an oil and gas lease in the usual form, and subsequently executed to appellee a surface lease authorizing such lessee to operate a "pick-up station" on the same land, the latter lease was subordinate to the former, but not in conflict with it.

4.    MINES AND MINERALS—RIGHT TO BUILD PICK-UP STATION.—An oil
and gas lease confers on the lessee the right to preserve the les-
see's own oil, and, if necessary, to erect a pick-up station or sta-
tions, and to hold oil captured in such station except as against
the true owner; but confers no authority to build such a station
merely to capture fugitive oil belonging to others.

5.    MINES AND MINERALS — CAPTURE OF FUGITIVE OIL — RIGHT TO
RECOVER.—Where the owner of land, after executing an oil and gas
lease to appellant's assignor, executed a second lease authorizing
appellee's assignor to erect a pick-up station, which appellee
thereupon erected, appellee will be liable to appellant for so much
only of the recaptured oil as belonged to appellant.

Appeal from Union Chancery Court, Second Divi-
sion; *Jordan Sellers,* Special Chancellor; reversed.

*Gaughan & Sifford,* for appellant.

*Powell, Smead & Knox,* for appellee.

WOOD, J.   On April 24, 1919, one R. P. Combs and
his wife executed an oil and gas lease to certain lands in
Union County, Arkansas, which, by mesne conveyances,
passed to the Standard Oil Company of Louisiana, here-
after called Standard company.   That company entered
upon the land and proceeded to develop the same under
the lease.   On August 2, 1921, Combs and his wife, the
original lessors, executed to one W. L. Murray a surface
lease on the lands which authorized Murray or his
assignees to operate what is commonly known as a pick-up
station on a small branch running through the lands, the
purpose of this station being to catch the waste and
escaping oil which ran down the branch.   Murray oper-
ated this station for a while and assigned the same to the
Oil Well & Salvage Company, hereafter called salvage
company.   On December 22, 1921, the salvage company
took possession of the lands and erected a dam across the
branch and also an earthen reservoir adjacent to the
branch which had a capacity of approximately 10,000
barrels of oil.   The salvage company, by the 12th of
January, 1922, had collected approximately 3,500 barrels
of oil.   About the 12th or 13th of January, 1922, the
Standard company informed the salvage company that
it objected to the latter company operating under its sur-

face lease, stating that the Standard company had had a break in its pipe line, and notified the salvage company to vacate the lease. The Standard company then began taking the oil from the salvage company's dam and from the creek, whereupon the salvage company instituted this action against the Standard company, and alleged that the Standard company had appropriated oil from its reservoir and from behind its dam over its protest, to the salvage company's damage in the sum of $12,400. It prayed that it have judgment against the Standard company for that sum, and that said company be enjoined from appropriating waste oil from the salvage company's leased premises and from taking any oil from the salvage company's reservoir and from the creek flowing through its leased premises.

The Standard company, in its answer, set up that it was the owner of the oil and gas lease by assignment from Combs and wife, and that it was the owner of the land in which the salvage company claimed to own surface rights for waste oil. It admitted that the salvage company had erected a dam, but denied that it was with the Standard company's consent or acquiescence, and alleged that the salvage company in so doing was a trespasser and was gathering and disposing of oil that belonged to others. It also denied the other material allegations of the complaint.

The salvage company introduced testimony tending to prove that from December 2, 1921, the time it established its pick-up station on the eighty acres of land covered by the lease, until January 18, 1922, it had picked up between 2,500 and 3,500 barrels of oil, and had sold a total of 958 barrels. There were some 3,500 barrels in the pit when the Standard company put its line in and commenced pumping. The salvage company had put in about a thousand barrels after the break in the Standard's pipe line. Seventy-two wells would drain oil into the watershed in which this branch or creek was the outlet. Both the Standard company and the Humble company

had wells within 250 and 560 yards of the pick-up station, the waste oil from which ran into the creek that came against the dam. The waste oil from other tanks besides that of the Standard company operating on the watershed that migrated and ran down this shed into the creek commingles with that of the Standard company. One of the witnesses for the salvage company estimated that there were from six to eight thousand barrels of oil that would have found its way into the salvage company's dam and storage tank. The oil was worth on an average of $1.50 per barrel at the time the Standard company appropriated the property. No one ever informed the representatives of the salvage company that it had no right to be on the premises. It cost the salvage company $450 to build the earthen storage and the piping and additional material cost about $300. The holdings of the salvage company consisted of its lease and the pick-up station, and one of its witnesses estimated that the reasonable cash market value of the holdings of the company was around $24,000 or $25,000. After the Standard company objected to the salvage company maintaining its pick-up station and claimed the right to take the oil and put in its larger powered pumps into the salvage company's pool and reservoir, the latter company discontinued operations because it was useless to proceed further. The salvage company protested and objected to the Standard company taking possession. The lease under which the salvage company operated was a lease whereby the lessor leased to the lessee and his heirs and assigns the surface of 117 acres of land including the land upon which the salvage company had established its pick-up station. It was recited in the lease that it was executed for the purpose of gathering, storing, and selling therefrom waste crude oil. The lease contained a further recital as follows: The lessee shall have the right to locate his plant at a point on the creek best suited for gathering crude, this lease to remain in force so long as waste crude oil is found in paying quantities.

Said lessee shall have the right to remove all tanks, machinery, boiler, or other equipment from the premises at the expiration of this lease and shall leave the premises in the same condition as found.  As a further consideration for the above lease, the said lessor shall receive one-eighth of all waste oil received, or its equivalent in cash.

The manager of the Standard company testified that during the months of December and January he had charge of the production of oil for the company in the El Dorado district.  The company was operating on eighty acres of land under an oil and gas lease.  It had six wells on the lease, and four of these wells drained into the creek on which the pick-up station already mentioned was situated.  Witness remembered when the station was built there, and went to see the lessor about it. Witness had told the lessor that the Standard company intended to put in a pit whenever they could accumulate the equipment, and explained to him that he would receive the same royalty from the pick-up station as from the company's wells.  The company credited the lessor with a one-eighth royalty out of the oil that was picked up on the occasion when the Standard company's pipe line broke.  The Standard company took no action to stop the operation of the pick-up station other than to notify the lessor that it would in time put a dam on the creek and pick the oil up themselves.  Witness understood that the lessor was interested in the pick-up station, and witness was remonstrating against it.  The Standard company always objected to having these stations operated on its leases, and its objection to the lessor was in line with its usual objection.  There was a break in the company's pipe line about 350 feet from the channel of the creek on which the pick-up station was situated, and the oil from this break would run directly into the creek and down it.  The witness notified the salvage company that he was directed by the Standard company to put its pump on the creek and pick up the oil that had been

wasted, and to continue such operation as long as any oil could be had from the creek. The Standard company itself put in a dam and pump about thirty days after this and pumped the oil out of the salvage company's pit and kept it going as long as they could get any oil. Some thirty days later the Standard company put in a dam. There were other places on the creek where oil could be picked up besides the salvage company's pick-up station. The Standard company was operating such a station at another place on the creek. The Humble company operated a pick-up station after the break in the pipe line of the Standard company. The wells that discharged into the creek between the Humble company's pick-up station and the salvage company's pick-up station were all Standard company wells except one.

There was a conflict in the testimony as to the amount of oil that was taken by the Standard company from the salvage company's pick-up station and as to the price of the oil, but it is unnecessary, in view of the conclusion we have reached, to set forth this testimony. One of the witnesses for the Standard company testified to the effect that, in bringing in wells and in building tanks, when they swabbed out wells on the watershed, the waste oil would drain into the creek and run down it, and, if this oil was not picked up, it would be a loss. There was not a great deal of oil on the creek after the Standard company picked up the oil that came from the line break. The Standard company had a surface pit on its lease up the creek, but didn't have any pick-up station, as far as witness knew.

The Standard company was operating under a lease which recites in part as follows: "That the said lessor, for and in consideration of one dollar, cash in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, has granted, demised, leased and let, and by these presents does grant, demise, lease and let unto the said lessee, for the sole and only purpose of mining and operating for oil and

gas, and laying pipe lines, and building tanks, power stations and structures thereon, to produce, save and take care of said products all that certain tract of land situated in the county of Union, State of Arkansas, described as follows, to-wit:

"In consideration of the premises the said lessee covenants and agrees: 1st. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises."

The trial court found the issues of law and fact in favor of the salvage company, and entered a decree in its favor in the sum of $5,760, from which decree the Standard company duly prosecutes this appeal.

1. The opinion in the case of *Crosson* v. *Lion Oil & Refining Co.,* 169 Ark. 561, was handed down by this court on October 19, 1925, and the opinion in the case of *Burton* v. *Miller,* 169 Ark. 740, was handed down November 2, 1925. Under the doctrine of these recent cases the oil that escaped from the Standard company's pipe line, and which found its way down the creek and into the salvage company's storage tank and pit, and also the oil from this pipe line which was in the creek and behind the salvage company's dam, as well as that flowing in the creek, was the oil of the Standard company, and the Standard company could follow it wherever it had migrated and recover it if it could identify the same from any third party who may have impounded it. We think it likewise follows from the doctrine of these cases that the Standard company was entitled to all the oil that was brought to the surface through wells on its lease, whether such oil had been confined in its pipe line or not, so long as the Standard company did not voluntarily permit the escape of such oil, and so long as it had not abandoned the project of reclaiming or recovering such oil. In other words, the Standard company was the owner of all oil produced from the wells it was operating which it had not allowed voluntarily to escape from its possession, wherever it could be traced and identified, and the Stan-

dard company was entitled to recover the same from any third party who may have impounded it.

There was testimony tending to prove that the Standard company not only took the oil that escaped from its own pipe line and wells which had been gathered into the salvage company's storage tank and pit and behind its dam, but also all the oil that was flowing down the creek from all other wells in the watershed that drained into this creek. In short, it was taking all the oil from the salvage company's pick-up station and from the creek behind its dam which would have ultimately been impounded by the salvage company, regardless of the source from which it emanated. It occurs to us that, as between the salvage company and the Standard company, the Standard company would have *prima facie* the superior right in all such oil under the provisions of its lease, which lease was prior to the surface lease of the salvage company. It will be observed that the Standard company's lease under which it operated was executed to the lessee "for the sole and only purpose of mining and operating for oil and gas and laying pipe lines and building tanks, power stations and structures thereon to produce, save and take care of said products," and in consideration of such grant and lease of the premises the lessee was to pay to the lessor the equivalent of a one-eighth part of the oil produced and saved from the leased premises. Under the express terms of the above lease to the Standard company, it certainly had the right to establish a pick-up station at the most eligible location on the leased premises to take care of and save all the oil produced from its own wells on those premises. The Standard company had the right, under its lease, to mine and operate for oil and gas, lay pipe lines, build tanks, power stations and structures anywhere on the leased premises to produce, save and take care of the oil and gas produced from those premises, and, in order to enjoy fully these rights, the Standard company might find it necessary or expedient to occupy the site, or sites, thereon best suited for the building of a pick-up

station for the gathering of waste crude oil. Therefore, since these rights were embraced in the lease of the premises to the Standard company, the lessor could not thereafter grant to a third party an exclusive lease of surface rights that would be in conflict with the rights already granted in the prior lease to the Standard company. The grant to the subsequent lessee of the surface right "to locate his plant at a point on the creek best suited for the gathering of waste crude oil" would be in necessary conflict with the Standard company's prior lease if the point on the creek best suited for the gathering of waste crude oil was likewise the point best suited for gathering oil and gas produced by the Standard company in the operation of its lease. Under such circumstances two such leases would be wholly repugnant to each other, and the prior lease would be paramount and superior. To be sure, the landowner and lessor would have the right, notwithstanding a prior lease of the premises for the production and conservation of oil and gas products, to grant surface rights to a subsequent lessee not in conflict with the provisions of the prior lease. A subsequent lease might be so worded as not to contain provisions repugnant to the provisions of the prior lease. Such subsequent lease might in express terms be made subject to the prior lease, or appropriate language might be used to protect the rights of the prior lessee, and thus avoid a conflict or repugnancy between the two leases. But, as we have stated, the lease under review contains no such language; and circumstances might arise, as above indicated, which would render the leases wholly in conflict with each other. For aught this record shows to the contrary, such conditions may have existed at the time this controversy arose. In order to warrant a recovery from the Standard company, the burden was upon the plaintiff, the salvage company, to prove that there was no conflict in the leases, and that the point where it had erected its pick-up station was not at a place essential to be used by the Standard company in the operation of its lease; that is, in the production, conservation and disposition of

oil and gas products on the premises covered by the prior lease to the Standard company. If the pick-up station erected by the salvage company was not at a point best suited for the conservation of the oil and gas products produced by the Standard company from its own wells, and was not essential for use by the Standard Company for the full enjoyment of the rights granted it under its lease, then the salvage company, under its lease, would have the right to build its pick-up station and would have the title to the fugitive and abandoned oil gathered by it in such station. But otherwise the salvage company, in entering upon the premises already leased to the Standard company without the consent or acquiescence of the latter company, would be a trespasser, and have no right whatever to the fugitive and abandoned oil it had gathered thereon. Because, if the Standard company had the right to use the site on which the salvage company's pick-up station was located in order to operate its own lease and to save and conserve the oil produced from its own wells, then if, in so doing, it also came into the possession of fugitive and abandoned oil that had found its way from other premises into the pick-up station erected by the salvage company, as between the salvage company and the Standard company the latter company would have the right and title to this fugitive and abandoned oil.

2.   The rights granted to the lessee and which passed by mesne conveyances to the Standard company were not a license, but an interest and easement in the land. itself. *Swert* v. *Robinson,* 289 Fed. 740; *Smith* v. *McCulloch,* 285 Fed. 689; *Rich* v. *Donaghey,* 3 A. L. R. 352; *Barnsdale* v. *Gas Co.,* 26 L. R. A. (N. S.) 614; *Blair* v. *Clear Creek Oil & Gas Co.,* 148 Ark. 300-310. The instrument under which the Standard company was operating being a lease and conveying an interest and easement in the leased premises to the lessee, the lessor had no right by a subsequent lease to convey any interest that would be in conflict with such prior lease, and those holding under the subsequent

instrument could not enter upon the premises and exercise alleged rights in conflict with the rights of those claiming under the prior lease without the knowledge, consent or acquiescence and over the protest of those holding under the prior lease. The salvage company had actual, as well as constructive, notice of the lease of the Standard company, and therefore, when it entered upon the land covered by the lease to the Standard company without its consent and erected its pick-up station, it was a trespasser, unless the pick-up station was erected at a point on the creek that did not conflict with the rights of the Standard company under its prior lease, as above explained. If the salvage company was a trespasser, then it had no title to the fugitive and abandoned oil in controversy, and was likewise not entitled to any reimbursement of the amount expended by it in the establishment of the pick-up station. *Pittsburg & W. Va. Gas Co.* v. *Pentress Gas Co. and Chartiers Oil Co.,* 7 A. L. R. 901; 38 Cyc. 1035; 26 R. C. L., pages 949 to 951; *Forsythe* v. *Shryack-Thom Grocery Co.,* 10 A. L. R. 711.

In reaching the above conclusion we have but followed, at least in principle, the opinion in the case of *Caldwell-Guadalupe Pick-Up Station* v. *Gregg,* handed down by the Court of Civil Appeals of Texas, June 26, 1925, reported in 276 S. W. 342. This opinion was elaborately and well considered, and we think its conclusions entirely sound, and do not hesitate to adopt them. It follows from what we have said that the court erred in entering a decree in favor of the salvage company. But, inasmuch as the cause has not been fully developed along the lines indicated in this opinion, the appellee's complaint will not be dismissed for want of equity. Instead, the cause will be remanded with leave, if the parties so elect, to amend their pleadings and take further proof in order to determine which of the parties, under the rules above announced, is entitled to the fugitive and abandoned oil gathered in the pick-up station erected by the salvage company or that would have been gathered in

such station, and which the Standard company appropriated to its own use.

McCULLOCH, C. J., (on rehearing). The views entertained by the majority call for modification of the original opinion, as well as of the judgment of this court in its directions to the trial court on remand of the cause.

Most of what is said in the original opinion is in accord with the views of the majority, but in some important respects the opinion does not conform to their present views.

We are of the opinion that there is no necessary conflict between the respective leases held by the parties from the same lessor. Our conclusion upon the facts is that appellee is entitled to recover from appellant the value of the oil taken by appellant from appellee's reservoir, except that portion which escaped from appellant's own pipe line or wasted from its own wells. In other words, our conclusion is that appellant was entitled to recapture its own oil, and no more. The lease held by appellant did not confer the right, independently of the conservation of its own oil, to erect a pick-up station or stations on the leased premises. There is nothing in the lease referring to the right to capture fugitive oil, and the only right in that respect is that which is merely incidental to the right to preserve its own product. A fair interpretation of appellant's lease is that it had the right to erect a pick-up station or stations necessary to protect its interest in the preservation of its own product, and would be entitled to the use of an available site for the most efficient accomplishment of that purpose. Incidentally, it would be entitled to hold fugitive oil captured in its own station except as against the true owner. The subsequent lease to appellee placed it in the shoes of the lessor, and conferred all the rights with respect to the erection and operation of pick-up stations, subject only to any superior rights of the prior lessee which might be in conflict. One of the leases was in subordination to the other, and they were not conflicting. A conflict might arise in the assertion of rights under the leases, but there

was no conflict upon the face of the instruments themselves, for the rights and interests conferred by the lessor in the two leases were in perfect harmony. No conflict could arise unless a hostile claim arose between the lessees as to the occupancy of a particular site for a pickup station. According to the undisputed evidence in this case, no such conflict arose, for the simple reason that appellant had never erected a pick-up station nor made any effort to do so, nor did it ever make any objections to the appellee to the latter erecting a station until the oil in controversy had been captured by appellee and appellant started to retake it, over appellee's objection. The question of superiority of rights in the erection of a station at that particular place is not involved in the present controversy. If the site occupied by appellee is the only available place for the erection of a pick-up station for use by appellant in preserving its own oil, then the rights of appellant are superior, and those rights may be asserted. But, as before stated, appellant had never attempted to erect a pick-up station, and appellee did not become a trespasser by occupying the site which appellant might have claimed if it was the one most available for use in the preservation of its own product. When the question of priority of the right to use a particular site arises, it must be determined upon the question whether or not it is essential to appellant in preserving its own oil. But that is not the question involved in the present controversy. Appellee's occupancy of the site was rightful until appellant asserted its superior rights thereto. Appellee being rightfully in possession, it is entitled to hold the captured oil against all comers, including appellant, except as against the true owner.

The views now expressed are not in conflict with the case of *Caldwell-Guadalupe Pick-Up Stations* v. *Gregg,* 276 S. W. 342, which has been so earnestly pressed upon our attention by counsel and relied on by the writer of the original opinion. We think that our views are really in harmony with the decision in that case. The facts there were that the plaintiff was the owner of an oil and gas

lease, and erected a pick-up station for the purpose of preserving its own product. The defendant was the holder of the junior lease, and also erected a pick-up station above the site occupied by the plaintiff, and which interfered with the operation by the latter of its station. Suit was brought by the plaintiff, alleging interference with superior rights, and under the decision he recovered on the ground that there was a necessary conflict between the assertion by the lessees of their respective claims. If the appellant in the present case had erected a pick-up station for the preservation of its own oil, it would have been in the same attitude as the plaintiff in the Texas case, and could have prevented appellee from erecting or operating a station which interfered with its own rights under the prior lease. But, as we have already shown, there is no such state of facts existing, for appellant has never erected a pick-up station nor asserted its right to do so until it became necessary to recapture its own oil, and then it claimed not only its own product but the fugitive oil which had flowed down the stream and had escaped from the wells of other owners. Appellant is therefore in no attitude to claim the fugitive oil which had been captured by appellee; it can claim its own oil and no more.

The judgment of this court will be modified, so as to direct the trial court to hear further testimony, if offered, as to the value of oil taken from the reservoir of appellee other than oil which had escaped from appellant's pipe lines or wells, and to render judgment therefor in favor of appellee. To that extent, and no further, the petition for rehearing is sustained.

WOOD, J., dissents.