QUALITY COAL COMPANY *v.* GUTHRIE.

4-6490                                     157 S. W. 2d 756

Opinion delivered December 22, 1941.

434

*Paul E. Gutensohn* and *Warner & Warner,* for appellant.

*Mark E. Woolsey,* for appellee.

GRIFFIN SMITH, C. J.   May 4, 1938, M. H. Guthrie and Donald McKenzie, who, *prima facie,* owned surface and mineral rights incident to Guthrie's island,[1] executed a written lease[2] whereby they ". . . gave, granted, demised and leased" for eight years the lands described.

---

[1] The property is in the Arkansas River in Franklin county. Allegations are that Guthrie owned the surface, and that as tenants in common the two plaintiffs owned an undivided three-fourths interest in a one-fourth interest of all minerals on, in, or under part of fractional sections seven and eighteen of township nine north, range twenty-six west, "containing in all 146.13 acres, more or less."

[2] Although appellant coal company contends that appellees granted an estate for years "in and to the coal underlying said land," the instrument by which the so-called estate was created is referred to as a lease.   (Appellant's brief, p. 50.)

Appellant company agreed to pay ten cents per ton for all coal mined and removed from the premises. If such transactions amounted to less than $500 per year, the difference ". . . between the royalty so paid and the said sum of $500," was due the lessors.

In September, 1939, appellees [3] alleged that the company, as an incident to mining and transporting, had constructed, beneath the stratum of soil underlying the coal, certain tracks; and, in disregard of protests by appellees, had used the tunnel and rail facilities in removing coal mined from lands other than those in which appellees had an interest, and not adjacent to the leased property. It was also charged, in effect, that rock and debris were taken from lands alien to the contract, and that facilities intended for use in mining appellees' lands, and available for no other purpose, were being wrongfully used. A fair charge for the use, it was said, would be five cents for each ton transported. An accounting was prayed, with judgment and injunction. An amendment to the complaint [4] charged that the company had violated its contract through failure to pay the tonnage charge on or before the fifteenth of each month; that it had not made complete reports of royalties; and there had been failure to develop and operate the mines in a workmanlike manner. There were other similar averments, coupled with a prayer that the contract be canceled.[5]

The answer was that prior to execution of the written contract appellant had mined coal from beneath the premises in question for which ten cents per ton was paid. It continued operations under the written lease. Underground workings and passageways had been constructed, and [appellant] ". . . owns all mine tracks . . . required for and used in removing . . . coal to the shaft located on other land."

---

[3] Guthrie and McKenzie will be referred to as appellees, although they are also cross-appellants.

[4] Filing date not shown.

[5] It was alleged that the company had admitted mining and removing 600 tons of coal during July and August, and that unpaid royalties for that period amounted to $60.

It was asserted that the operations complained of were consented to by appellees when the contract was made. Another contention was that appellees, in "granting and demising" the lands, with the right to mine and market coal, authorized use of the tunnels, etc., ". . . and defendant avers that in granting said premises, . . .[there was a grant of] minerals under such surface to the extent of the space occupied by such minerals while in place, and that [appellant] is entitled to use any such . . . tunnels for any . . . lawful purpose, including the right to transport, through the same, minerals or other substances taken from adjoining lands."

Finally, it was declared that M. H. Guthrie had orally agreed that the mining facilities might be used for transporting tonnage from other lands; that the lease was prepared by Guthrie, mutual intentions being to have the privilege expressed; that if the right were not inferable from the writing the omission was a mutual mistake, and there should be reformation.

In an amended answer appellant denied having violated the contract. It also pleaded that appellees had received, with monthly regularity, royalty payments with knowledge of use to which the property was being put; therefore they had waived damages, if in fact any accrued.[6]

Testimony was taken on three occasions when the court granted hearings, with final decree and judgment December 20, 1940. With permission appellees amended their complaint (Dec. 20) and asked judgment for $500 as the amount due for 1940 under the minimum royalties clause.

The court found that the transportation facilities constructed by appellant were installed for the purpose of removing coal appurtenant to appellees' land; that operations were continued until August, 1939; that with discontinuance of work benefiting appellees, appellant

---

[6] In its answer to the amended complaint (filed February 10, 1940) appellant admitted ". . . there is still a considerable amount of merchantable coal remaining [on the lease] which defendant will mine and produce just as soon as physical conditions will permit it to do so with safety. . . ."

began mining and moving coal from under the channel of the Arkansas River without consent of appellees, and transported it as alleged. There was the further finding that a quantity of coal remained on the leased property, and that appellant had refused to mine it. The lease was terminated and judgment given on the basis of two cents for 58,090.72 tons hauled from the river bed, for which appellant had paid the state at six cents. Judgment was for $1,161.80.

Appellees cross-appealed from the court's order denying recovery of $500; also from the finding that two cents per ton was reasonable for use of the facilities.

Appellant thinks express terms of the lease "granted and demised" to it an interest in the land; therefore it is immaterial whether the instrument be termed a "conveyance," a "deed," a "contract or lease." In any view that may be taken, it is argued, legal effect of the words employed in creating the estate vests in the defendant, by operation of law, title to the coal for the term specified. From this premise appellant insists that since an actual interest in the land was conveyed, as distinguished from a naked license to mine coal, the lessee was entitled to use of underground passages it constructed, whether the purpose being served was removal of coal or debris from appellees' lands, or from lands in which appellees had no title or equity.

Words following the grant and the land description qualified appellant's interest. By express limitation, the lease was "for the purpose of mining, removing, and selling coal, . . . with the right to enter . . . upon said premises for the purpose of prospecting."

Two rights were created: (a) The right to mine and remove coal. (b) The right to prospect.

In *Standard Oil Company* v. *Oil Well Salvage Co.*, 170 Ark. 729, 281 S. W. 360, it was held on original consideration, in an opinion written by Mr. Justice Wood, that the right acquired by a lessee, which passed to the Standard Company by *mesne* conveyances, was not a license, but an interest and easement in the land itself. The lessor granted to a company the right to erect a

salvage plant on the premises developed by Standard. The lease held by Standard gave it use of the surface to lay pipes, to mine and operate for oil and gas, build tanks, power stations; to erect structures anywhere on the leased premises to produce, save, and take care of the oil and gas. The court held that Standard, having captured the oil in question (and the oil having escaped without an intent that it should) might recover the commodity wherever identified.

On rehearing (opinion by Chief Justice McCULLOCH) the decision of June 18, 1926, was modified. It was held that the appellee, (salvage company) in erecting its station under the subsequent lease, had not impinged Standard's rights because there was no showing that Standard required, for conservation of its products, the location utilized by appellee. It was stated that the question of superiority of rights in the erection of a station "at that particular place" was not involved in the controversy.

The holding in *Osborn* v. *Arkansas Territorial Oil & Gas Co.*, 103 Ark. 175, 146 S. W. 122, is that a gas lease is a contract granting to the lessee the right to explore the land and to produce gas when found. But, ". . . It is not a present sale or transfer of title to the gas." There is the further statement that on account of its vagrant [migratory] nature, gas does not become actually owned until possessed.

A headnote to *Goodson* v. *Comet Coal Company,* 182 Ark. 192, 31 S. W. 2d 293, is to the effect that a lessee for years who under his contract had the right to mine subsurface coal did not take title to coal in place. Appellant says the statement of Mr. Justice FRAUENTHAL in the Osborn-Gas Company case is dictum and that it was "overruled and rejected" in *State ex rel. Attorney General* v. *Arkansas Fuel Oil Company,* 179 Ark. 848, 18 S. W. 2d 906. We do not agree. This was a tax suit prosecuted under authority of Act 30, approved March 1, 1897.[7] Although the opinion quotes from *Standard Oil Co.* v. *Oil Well Salvage Co., supra,* and *Clark* v. *Dennis,* 172 Ark. 1096, 291 S. W. 807, where in substance it is said that an oil and gas lease conveys not merely a license,

[7] Pope's Digest, § 13600. [But see Act 221, 1929.]

but an interest and easement in the land itself, the point decided was that in a suit to impose a lien upon the lease, the action is local.

In an appeal styled *B. H. & M. Oil Company* v. *Graves,* 182 Ark. 659, 32 S. W. 2d 630, Bettie Graves sought to restrain her husband and the oil company from disposing of oil taken and to be taken from a lease in which Buchanan Graves, Jr., (husband) formerly owned an interest. The decree in favor of Bettie Graves was affirmed, two judges dissenting. *Tatum* v. *Tatum,* 174 Ark. 110, 295 S. W. 720, 53 A. L. R. 306, was relied upon as authority for the decision of this court.

*Arrington* v. *United Realty Co.,* 188 Ark. 270, 65 S. W. 2d 36, 90 A. L. R. 765, quotes with approval from *Hager* v. *Stakes,* 116 Tex. 453, 294 S. W. 835, the holding being: ". . . such [oil and gas leases] create a severance of the estate in the surface from the estate in the oil and minerals, which may be owned in their entirety by different parties. . . ."

While in Arkansas the two interests may be severed, we do not understand that the mere fact of leasing lands for exploration purposes *ipso facto* creates such severance.

Holdings of this court that a mineral lease with easement rights creates an interest in the land do not go to the extent of saying that the interest so created is synonymous with present ownership of the minerals; nor is an easement and the interest in land which attaches by virtue of a mineral lease such an estate as will give to the lessee dominion over the land for purposes other than those expressed in the writing, or necessarily implied from the nature of the undertaking.

The Graves case appears to have been an equitable determination that sale by the husband of all his interest in valuable oil deposits pertaining to "worthless" lands should not have the effect of denuding Bettie Graves of her rights. The husband, in executing a warranty deed reciting that he was a single person, acted fraudulently. The property affected was acquired by Graves, Jr., from his parents, who also conveyed by warranty deed, as

440

distinguished from a lease; hence, the case is not authority for appellant's contentions in the instant appeal.

In the Tatum case Chief Justice Hart referred to the wife's interest as a right, "whatever it may be." Again, he said: "Here . . . the grantees have drilled oil and gas wells and have thereby opened up the mine. The wife has a contingent interest in it which should be protected just as the remainderman had a right to protect his interest [in *Cherokee Construction Co.* v. *Harris,* 92 Ark. 260, 122 S. W. 485, 135 Am. St. Rep. 177]."

Estimates of what a fair charge would be for use of appellees' land through which the tunnel was driven varied from half a cent to five cents per ton. From all the testimony the chancellor concluded that two cents per ton was reasonable. We cannot say this finding was contrary to a preponderance of the evidence.

We are also of the opinion that appellees, in asking that the lease be cancelled, waived their rights to payment of such part of the $500 guarantee as may not have been accounted for in royalty remittances.

There is evidence that marketable coal remains on the leased property. The chancellor apparently found that appellant considered it more profitable to conduct mining operations on the state's land where the royalty charge was six cents per ton, as contrasted with ten cents appellees were entitled to.

Affirmed, both on appeal and cross-appeal.