QUALITY EXCELSIOR COAL COMPANY *v.* REEVES.

4-7206                                    177 S. W. 2d 827

Opinion delivered January 31, 1944.

714

*Harper & Harper,* for appellant.

*Warner & Warner,* for appellee.

McFADDIN, J. This appeal concerns some of the relative rights and duties of the lessor and the lessee in a coal mining lease.

Appellee, as lessor, filed suit in the chancery court to enjoin the appellant, as lessee, from using the subterranean passages under lessor's land for removing coal from adjacent lands, and also to recover damages at five cents per ton for all coal from adjacent lands so removed through the subterranean passages under lessor's land. Appellant demurred to the chancery jurisdiction, and also pleaded laches and estoppel, and claimed that the right to use the subterranean passages was an implied part of the lease under the facts in this case. The chancery court found for the appellee and awarded damages at 1½c per ton on all coal from adjoining lands hauled under lessor's land (which damages amount to $625), and also enjoined appellant from such unau-

thorized use of the subterranean passages. This appeal followed.

The lease here involved was executed in 1936 when appellee, Reeves, as lessor, entered into a lease contract with Quality Coal Corporation, as lessee, whereby lessor granted to lessee "the right to mine and remove the coal remaining beneath the surface of" 160 acres in a square block for the term of ten years . . . with the privilege of renewal for five years additional. The lessee, among other things, agreed: (1) to mine the coal continuously, actively, "and in a method calculated to insure the eventual mining of the largest amount of coal from the premises; and (2) to pay royalty at fifteen cents per ton for each ton of coal mined from the premises; and (3) if for any year "the total amount of royalty accruing to the lessor on the basis of fifteen cents per ton on all coal mined does not equal $600 a year, a sufficient additional sum will be paid by lessee to lessor which when added to the royalty already paid, will equal $800 for each year"; and (4) to furnish lessor each six months proper and sufficient maps and plats covering the underground operations; and (5) to allow lessor "at all times to enter the leased premises . . . and all entries and working places for the purpose of examining and surveying same"; (6) at the termination or expiration of the lease to surrender the "premises, rights, privileges, and easements hereby granted together with all mines, entries, openings, and passageways located therein or thereunder."

The lease was, with the consent of the lessor, assigned to the appellant herein, which was thereafter treated as the lessee. We will refer to the parties herein as "lessor" and "lessee" just as though the present appellant had been the original lessee. Operations have been continuous since 1936, and coal has at all times been mined from the lands of the lessor. The lessee has installed machinery and equipment valued in excess of $60,000, and has paid the lessor royalties aggregating $48,000. The surface opening is located on lands north of, and adjacent to, the leased lands here involved. The

main slope, tunnel, or subterranean passage, under lessor's land, extends almost due south through the center of the 160-acre block, and has been extended in this direction as the coal was mined. Side entries extend east and west from the main slope to the boundaries of the 160 acres. When the suit was filed and tried below, the main slope extended south from the lessor's land into adjacent lands, and some of the entries also extended to other lands. Appellant is mining coal from adjacent lands to the south and to the east of lessor's lands, and is hauling this coal from the adjacent lands through the subterranean passage of the main slope on lessor's lands to the surface opening located on the lands immediately north of lessor's land. Other facts will appear in this opinion. Several questions are argued in the briefs and will now be considered.

I. *The Right of the Lessee to Use the Passages Under the Lessor's Land to Remove Coal from Other Lands.* At the outset appellant concedes that the lease under consideration contains no express grant to the lessee to use the passages under the leased lands to remove coal from other lands, but insists that the right is an incident to the lease and is implied in the lease so long as the lessee is removing coal from the leased premises. Appellee contends that this right of passageway must be expressly granted or it is denied. There are two lines of authority on this question. In those jurisdictions where a coal mining lease is a sale of the minerals in place, then the lessee is generally held to have the right of haulage as here sought by appellant: *N. Y. & Pittston Coal Company* v. *Hillside Coal & Iron Company,* 225 Pa. 211, 74 Atl. 26; *Middleton* v. *Harlan-Wallins Coal Corp.,* 252 Ky. 29, 66 S. W. 2d 30. See, also, Annotation in 15 A. L. R. 857 for other cases. But in Arkansas we have clearly held that a coal mining lease is not a sale of the minerals in place, but only a right to mine and remove the minerals in accordance with the lease. *Goodson* v. *Comet Coal Co.,* 182 Ark. 192, 31 S. W. 2d 293; *Quality Coal Co.* v. *Guthrie,* 203 Ark. 433, 157 S. W. 2d 756. In the first of these cases *(Goodson* v. *Comet Coal*

*Co.)* the mine operator (lessee) secured from the owner of the minerals a special instrument granting the right to use the underground passages to haul coal from adjacent lands. This would clearly imply that the right did not exist in that lessee independent of a special agreement. In the second case *(Quality Coal Co.* v. *Guthrie)* it was clearly held that the lessee did not have the implied right to use the underground passages to haul coal from adjacent lands. So we stand committed to the rule that the right of haulage from adjacent lands is not a right incidental to, or implied in, a coal mining lease.

One of the most scholarly and exhaustive opinions on this subject is that of *Percy La Salle Mining & Power. Co.* v. *Newman Mining & Milling & Leasing Company* decided by the United States District Court in Colorado and from which there was no appeal. This opinion is reported in 300 Fed. 141, and has been cited in several jurisdictions. We quote from it extensively:

"What does a mining lease vest in the lessee? *Providence Mining & Milling Co.* v. *Nicholson,* 178 Fed. 29, 101 C. C. A. 157, held that a mining lease conveys nothing but a right to search for and extract the minerals, and that the lessee acquired no other rights, and that the title in all other respects remained in the lessor. See, also, *Butler* v. *McGorrisk, et al.,* 114 Fed. 300, 52 C. C. A. 212. In *Ewert* v. *Robinson, et al.,* (C. C. A.) 289 Fed. 740, Judge KENYON's review of the authorities construing leases shows that in the western states, at least, in the absence of an expressed covenant, the ordinary oil or mining lease conveys no title to the mineral in place. Further, the Supreme Court held in *United States* v. *Biwabik Mining Co.,* 247 U. S. 116, 38 Sup. Ct. 462, 62 L. Ed. 1017, that a mining lease was not to be construed as a conveyance of ore in place, in spite of the fact that the latter could be measured with substantial accuracy. In other words, it grants merely an incorporeal hereditament or easement, and not an estate in fee.

"What the lessee contends for here is the right to mine by 'outstroke,' which means the raising or removal

of ore from a mine adjoining the demised premises through a shaft or opening on the latter. In White on Mines and Mining Remedies (an English work) 126, after defining 'instroke' as being the right to raise or take ore from a leased mine through the shaft or tunnel of an adjoining mine, and defining 'outstroke' substantially as above, the author says:

" 'A lessee has by implication the right to work by instroke, and can exercise such right without an express stipulation in the lease to that effect, although he cannot work by outstroke without the express consent of the lessor, or covenant in the lease giving him such right. The right does not exist in the lessee by implication, but must be specially covenanted for before it can be rightfully exercised, for, though the lease of a mine carries with it to the lessee the right to use the space or chamber from which the ore is contained, the right extends only to the minerals demised, and would not authorize the lessee to use the same for the conveyance of minerals from any other mine, and such use would entitle the lessor to collect a way lease rent by way of compensation for the exercise of the privilege.'

"In Stewart on Mines and Mining (1894), also published in England, it is held (pages 115, 116) that the right to mine by instroke goes to lessee by implication; but the right to mine by outstroke is excluded, except where specifically covenanted for in the lease, because . . .

" 'In outstroke working, on the other hand, the lessee makes use of lessor's mine for a purpose not implied in the lease. Such a right cannot be inferred.'

"Barringer & Adams, Mines and Mining (1897), page 578, says: 'On the other hand, surface rights and the incidental rights, such as that to use shafts, whether expressed or left to implication, may be used for the purpose only of mining under the particular premises conveyed, and not as a means of removing minerals from other lands.'

"And on page 584, under 'Rights-of-Way,' it is said: 'Rights-of-way annexed to rights to mine, or granted for the purpose of removing and transporting minerals to the mine, may not be used for other purposes, as for general railroad purposes; nor, in the absence of expressed provision, can they be used for the transportation of minerals from other mines. And consequently the owner of the mineral, with the privilege of a right-of-way, may not give to others the right for general or other purposes of transportation.'

"And further, on page 585: 'Where adjoining mines are in the same possession, and it is convenient to work one of them through a shaft or pit made for the other, the right to do so does not exist, in the absence of express power. The owner of the fee may prevent the use of his land in connection with the working of other mines.'

So we conclude that the lessee did not have the unrestricted right to use the passages under the lessor's land to remove coal from adjacent lands.

II. *The Measure of Damages.* Having determined that the lessee did not have the right to use the tunnel or passage under the lessor's land to remove the coal from adjacent lands, we come to the measure of damages for such use. Appellant contends that the damages are purely nominal; but appellee contends for the haulage royalty basis as was applied in *Quality Coal Company* v. *Guthrie, supra:* that is, damages at a certain amount per ton for all coal from adjacent lands hauled through the tunnel on lessor's land. In *Benton Gravel Co.* v. *Wright, post,* p. 930, 175 S. W. 2d 208, we had occasion to consider the measure of damages to real estate when the injury was (a) temporary, and (b) permanent. The rules there stated ordinarily apply. But in the case at bar neither of these situations exists, for here the lessee had the right to use the passageway under lessor's land for removing coal from lessor's land, but not for removing coal from adjacent lands; and the two removals were going on simultaneously. So the use of the tunnel by the lessee was not an entirely tortious taking, or an entirely tortious damage, within the meaning generally given those terms, but was

in the nature of a trespass so far as the passage was used for transporting coal from adjacent lands. The diminution in the value of the lessor's land by the trespass in the subterranean passage would afford no criterion for damages, so we must seek some other measure or other standard.

In 63 C. J. 1052, in discussing the measure of damages for continuing trespasses, the rule is stated: "The measure of damages for an appropriation for a use of the land by a continuing trespass is the worth of the use of the property." Likewise, in 26 R. C. L. 973, in discussing injury to real property by trespass, the rule is stated: "Moreover, when the defendant has beneficially occupied the property, he may be held liable in an action of trespass for its fair rental value, even though the plaintiff was not hindered or obstructed in any use which he expected to make of the property." In *Baltimore-Ohio Ry. Co.* v. *Boyd,* 67 Md. 32, 10 Atl. 314, 1 A. S. R. 362, the railroad company had for a number of years trespassed on the lands of Boyd, and on the measure of damages, the Supreme Court of Maryland said: "It is true, there is no evidence whatever of any special damages sustained, or that the plaintiffs were hindered or obstructed in any proposed use of their lot, by reason of the presence and use of the railroad tracks; but, nevertheless, we are of opinion that the plaintiffs are entitled to a reasonable compensation for the use of their land, and we think this is measured by what would be a fair rental value for the ground, occupied as it has been for the time covered by the actions, and nothing more. In such cases as the present, where there is nothing to show that any special damage has been suffered, the principle seems to be established by many respectable authorities, that the plaintiff is entitled to recover such compensation as the use of the ground was worth during the time and for the purpose it was occupied."

The same rule is recognized in Sutherland on Damages, 4th Ed., Vol. 4, § 1014, and has been invoked and applied in coal mining cases. In the English case of *Whitwham* v. *Westminster Brymbo Coal & Coke Company*

(1896), L. R. 2 Chancery Division 538, there was involved a coal mining lease and trespass to the land of the lessor. The defendant trespassed by carrying coal from adjacent lands in the underground through the plaintiff's mine, and the damages were assessed against the defendant for the wrongful use at what according to the custom of the neighborhood would have been charged for the "way-leave"; that is, if A, without leave of B, used the land of B for the purpose of A, then A should pay for the user on the basis of the value of the use. The court cited *Martin* v. *Porter,* 5 M. & W. 351; *Jegon* v. *Vivial,* L. R. 6 Ch. 742; *Phillips* v. *Homfray,* L. R. 6 Ch. 770, as authority for this "way-leave" rule of damages. Lindley, L. J., said: "It is unjust to leave out of sight the use which, the defendants have made of this land for their own purposes, and that lies at the bottom of what are called the 'way-leave' cases. Those cases are based upon the principle that if one person has, without leave of another, been using that other's land for his own purposes he ought to pay for such user. The law is now settled by *Jegon* v. *Vivial,* which has been approved by the House of Lords in *Livingston* v. *Rayards Coal Co.,* Appeal Cases, 25."

It is interesting to note that "way-leave" is the expression used in England, and "haulage royalty" is the expression used in Arkansas, but both expressions mean the same. This all gets us to the conclusion, which is: that the court here assessed the damages at 1½ cents per ton on all coal mined from adjacent lands and hauled through the subterranean passageways of lessor's land; and we find that the measure of damages was based on the "haulage-royalty" in the coal field where the land was located, and we affirm both the method of arriving at the damages and the rate of "haulage-royalty" as awarded by the chancery court in this case.

III. *The Jurisdiction of Equity.* Appellant has at all times objected to this cause being prosecuted in the chancery court; but we hold that equity had jurisdiction. The lessee was using the passageway under the lessor's land for mining coal from lessor's land, and to that extent

the use was lawful and proper under the terms of the lease; but at the same time the lessee was using the same passageway under the lessor's land for transportating coal from adjacent lands, and this latter use was a trespass. Thus there was a continuing trespass, and if the lessor should be relegated to an action at law for each trespass, then there would of course be a multiplicity of suits. So, because of the continuing trespass and the multiplicity of suits, the remedy at law was inadequate and incomplete.

In 18 R. C. L. 1252, in the topic of "Mines," it is stated: "and it has often been held that an injunction will be granted to prevent continuing waste or continuing trespass." Cases from many jurisdictions are cited to sustain the text. See, also, 36 Am. Jur. 423. There is an annotation on this subject in 32 A. L. R. 463, and on page 544 thereof cases are listed where such injunctive relief has been granted against trespass on railroads; and on page 546 thereof cases are listed where such injunctive relief has been granted against the removal of gravel and stone. The annotation is supplemented in 92 A. L. R. 578. See, also, *Missouri Pacific Railroad Co.* v. *Hobbs,* 178 Ark. 1146, 13 S. W. 2d 610, and *Brown* v. *Myers,* 200 Ark. 511, 139 S. W. 2d 298. Equity has jurisdiction to issue an injunction to prevent a continuing trespass as opposed to spasmodic or sporadic acts of trespass where the remedy at law is inadequate and incomplete. As stated by Chief Justice McCULLOCH in *Boswell* v. *Johnson,* 112 Ark. 159, 165 S. W. 295: "In other words, equity will interfere unless the remedy at law is adequate and complete. It is not sufficient, to prevent equitable interference, that there is a remedy at law unless it is adequate."

There is also as a basis for equitable jurisdiction in this case the prevention of a multiplicity of suits between lessor and lessee for the continuing trespasses. It is true that in *Ellsworth* v. *Hale,* 33 Ark. 633, this court said: "To warrant the interference of chancery on the ground, alone, of preventing multiplicity of suits, the same rights should be claimed by different persons

against one, or by one against many.'' But this quoted sentence went further than the present day authorities go and is not in line with modern holdings. The better rule, and the one to which we now adhere, is found in 32 C. J..56 as follows: ''As a general rule, where an injury committed by one against another is continuous or is being constantly repeated, so that complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction.. The fact that an injured person has the right of successive actions for the continuance of the wrong does not make it an adequate remedy at law which bars the jurisdiction of a court of equity to grant an injunction to restrain the continuance of the injury.'' So we hold that the cause here was properly cognizable in equity.

IV. *Conditions Imposed on Relief to Plaintiff.* Having found that the cause is cognizable in a court of equity, and that relief may be granted by injunction, it follows as a corollary that the court may impose conditions on the relief to be granted the plaintiff, or may grant other relief in lieu of injunction. One of the peculiar attributes of a court of equity is the power to mould the relief to fit the particular case. There are salient facts in this case that call for the exercise of this equitable power. It has been previously pointed out that the main tunnel or passageway under the lessor's land ran from north to south through the approximate center of the 160-acre block and that the entries extended west and east from the main tunnel as the coal was mined, beginning at the north. The long wall method of mining was used, and the entries were spaced at 400-foot intervals. The west entries were at right angles to the main tunnel, but the east entries were each at an acute angle to the main tunnel, the acute angle being on the north side, so that the east entries were from southwest to the northeast. The fifth and sixth east entries left the main tunnel on southerly adjacent lands in order to reach the coal in the southeast corner of lessor's land, and the sixth west entry left the main tunnel likewise on lands south of and adjacent to lessor's land.

All of these facts were known to the lessor, as he was regularly furnished maps each six months. The fact could have been, and was actually, determined several years ago, that coal would have to be mined from adjacent lands in the fifth and sixth east entries in order to reach the coal in the southeast corner of lessor's land; as also the fact that coal would have to be mined from adjacent lands in the sixth west entry in order to mine all the coal in the southwest corner on the lessor's land. Furthermore, there was evidence that the lessor originally told the lessee's officers that lessor would aid lessee in securing leases on these adjacent lands. While these facts are not sufficient in themselves to constitute laches or estoppel so as to defeat the right of the appellee to secure relief in equity, still we think these facts, and others in the record, are sufficient to cause the equity court to temper the injunction from an absolute injunction to a conditional injunction.

Conditions may be imposed in injunction cases. In 28 Am. Jur. 479 it is stated: "The power of a court of equity, in the exercise of its sound discretion, to grant, upon equitable conditions, the extraordinary relief to which a plaintiff would otherwise be entitled, without condition, is undoubted; and in granting injunctive relief, the court may and in fact should impose such terms and conditions as the justice and the equities of the case require."

Furthermore the court may award damages in lieu of injunction. As stated in 28 Am. Jur. 477: "A court of equity may award damages as an alternative to an injunction, or in lieu thereof. Such relief should be granted where injunction is denied to one otherwise entitled thereto. Where a plaintiff is entitled to an absolute and unconditional judgment of injunction, the defendant cannot complain that the court allows him to be relieved from the injunction upon the payment of damages. Thus, where the granting of an injunction would work greater damage to an innocent defendant than the injury from which the plaintiff prays relief, the injunction may be refused and the plaintiff awarded such compensation in

damages as will make him whole. Thus in injunction to restrain a nuisance, the court, after ascertaining the damages suffered and thereafter to be suffered by the plaintiff from the injury complained of, may grant the injunction—to be issued, however, only on the failure of defendant to pay the amount of the damages.''

Here an injunction is sought to restrain a continuing trespass, and the chancery court has ascertained the damages suffered to be 1½ cents per ton of all coal hauled from adjacent lands through the subterranean passageways of lessor's lands. The evidence shows that this same measure of damages will continue to apply. So the court has the power to grant the injunction to issue on motion of lessor whenever lessee fails to pay in the regular manner the haulage royalty of 1½ cents per ton on all coal mined from adjacent lands and hauled under lessor's lands.

In *Jones* v. *Kelly Truck Co.*, 179 Ark. 857, 18 S. W. 2d 356, Mr. Justice MEHAFFY, speaking for this court, said: ''It has been repeatedly held that a chancery court has the right to ascertain what damages will result in the doing of a certain thing and requires the party wishing to do the act to pay the damages, and, upon its refusal to do so, to enjoin the commission of the act.'' This quoted statement is in keeping with the cases of *McCleery* v. *Highland Boy Gold Mining Company, supra; Sussex Land & Livestock Co.* v. *Middlewest Refining Co.*, 276 Fed. 932, and 294 Fed. 597. See, also, *Knoth* v. *Manhattan Ry. Co.*, 109 App. Div. 802, 96 N. Y. S. 844 (affirmed in 187 N. Y. 243, 79 N. E. 1015); *N. Y.* v. *Pine*, 185 U. S. 93, 46 L. Ed. 820, 22 S. Ct. 592; and see annotation in 31 L. R. A., N. S., 898.

Applying these principles to the peculiar facts and circumstances in this case we reach the conclusion that the decree of the chancery court should in all things be affirmed, except as to the granting of a permanent injunction; and so much of the decree as awarded the appellee a permanent injunction is reversed and remanded to the chancery court with instructions to enter a decree providing that if within thirty days from the entry

of said decree the lessee (Quality Excelsior Coal Co.) or its successors or assigns (if there has been a transfer) shall pay or tender to the lessor or his heirs or assigns the damages assessed in the decree ($625) together with interest at 6 per cent. from Aprpil 28, 1943, until paid and all cost of this suit in the chancery court and also in this court, and also all damages since April 28, 1943, to date of entry of said decree, to be computed at 1½ cents per ton on each and every ton of coal mined from adjacent lands and hauled or transported through the subterranean passages under lessor's land, then said injunction will not issue, but otherwise injunction may issue restraining lessee (appellant here) and its successors, assigns, agents and employees from the commission of trespass as found in this opinion. And the decree to be entered in the chancery court will further provide that unless the lessee, its successor or assigns, (if there be a transfer) shall pay or tender to lessor, his heirs or assigns, damages in the nature of haulage royalty at the rate of 1½ cents per ton on each and every ton of coal mined from adjacent lands and hauled or transported through the subterranean passages of lessor's lands, on or before the twentieth day of each month for the preceding calendar month, together with full statement and report (in form and manner and at times as provided in lease for lessor's regular royalty) so long as the use shall continue (but not longer than the life of the lease or extension thereof under which lessee is mining coal from lessor's land here involved), then the chancery court will entertain and may grant motion of lessee, his heirs or assigns for a permanent injunction as prayed in the amended complaint heretofore filed in this cause.