Ark. Foundry Co. *v.* Farrell.

5-3230                                385 S. W. 2d 26

Opinion delivered December 7, 1964.

[Rehearing denied January 11, 1965.]

*Barber, Henry, Thurman & McCaskill, House, Holmes, Butler & Jewell, John B. Moore, Jr., Owens, Mc-Haney & McHaney,* for appellant.

*Sharp & Sharp,* By *James B. Sharp* and *John D. Thweatt,* for appellee.

George Rose Smith, J. This is a suit by the appellants to enforce laborers' and materialmen's liens arising from the partial construction of a warehouse building in the city of Brinkley. The only serious question is whether the lienors are entitled to enforce their claims against the land as well as against the building. The chancellor held that the claimants have no lien against the land.

The trial extended over several days, producing a record comprising eleven volumes of pleadings, testimony, and exhibits. We find it unnecessary to set out the conflicting evidence in detail; for even if it should be conceded that the proof establishes the fact situation relied upon by the appellants in their brief they are still not entitled to a reversal of the decree.

758

The unfinished warehouse was built by Charles Malham and his brother upon vacant lots owned by Paul M. Farrell as trustee. Farrell (and the members of his family for whom he acted as trustee) owned a number of substantial business enterprises. Over a period of years Charles Malham had been employed by the Farrell interests as a laborer and in other positions of neglible responsiblity. Malham and Paul M. Farrell were personal friends and fellow church members. On many occasions Farrell had befriended Malham, as. by advancing funds (which were not repaid). Some two years before the building in controversy was begun Farrell had assisted Malham in entering the business of buying and selling soybeans. In this venture Farrell provided much of the needed equipment and allowed Malham to occupy some vacant land rent-free.

In the fall of 1958 Malham proposed that he expand his operations by constructing a $45,000 grain warehouse having a storage capacity of 341,000 bushels. Malham and Farrell discussed the proposal several times. Malham planned to finance the venture, at least in part, by collecting advance storage charges from farmers who would be patrons of the warehouse. Ultimately Malham succeeded in raising more than $20,000 in this fashion and used the money in the construction.

Malham testified that Farrell agreed to help him in the project and to permit him to use the land now in dispute either rent-free or under a long-term lease that would be agreed upon later on. Farrell contradicts Malham's testimony to some extent, but in deciding this appeal we may take Malham's version to be correct.

In October of 1958 Malham employed a contractor and began to erect the warehouse upon the Farrell land. Farrell insisted at the trial that Malham's entry upon the land was an out-and-out trespass, but we think it plain that Farrell consented to Malham's occupancy of the property. There is, however, no suggestion that Farrell made any affirmative statement or took any affirmative action that might lead the laborers and materialmen

to think he meant to subject the land itself to their liens. All that can be said is that Farrell stood by and allowed the construction to proceed. Eventually Malham came to the end of his resources and had to abandon the venture before the building was complete. There is evidence that Malham succeeded in finding sufficient financial backing to enable him to offer to buy the land, but Farrell refused to sell the property "at any price." Within apt time the appellants sought to enforce their liens against the land as well as against the improvement.

It is recognized by the appellants that, under the statute, they must show that their labor and materials were furnished pursuant to a contract with the owner of the land or with his agent. Ark. Stat. Ann. § 51-601 (1947). In contending that this burden has been met counsel rely upon a line of cases involving leases that required the tenant to make improvements upon the premises. In that situation the tenant is held to be the landowner's agent.

The landmark case is *Whitcomb* v. *Gans,* 90 Ark. 469, 119 S.W. 676. There the written lease *obligated* the tenant to make improvements and repairs costing not less than $400. In holding that under such a lease the tenant acted as the landlord's agent in contracting for the construction work we left open the question whether the same rule would apply if the landlord had merely consented that the tenant might, at his option, improve the property: "We need not go so far as to hold that a lessor may make his property subject to lien merely by consenting for the lessee to make improvements. The lessor, in the present case, did more than that. She not only consented to the making of the improvements, but she bound the lessee to do so."

The issue left open in the *Whitcomb* case was squarely presented in *Hawkins* v. *Faubel,* 182 Ark. 304, 31 S.W. 2d 401, where the lease did not *obligate* the tenant to make the contemplated improvements. In holding that in this situation the land itself was not subject to a materialman's lien we said: "We now decide the question

reserved in the case of *Whitcomb* v. *Gans, supra,* and we hold that the lessor does not make his property subject to lien merely by consenting for the lessee to make improvements.''

That case governs this one. Counsel for the lienors candidly concede that the terms of Malham's supposed oral agreement with Farrell were ''nebulous.'' Not even under the most favorable view that might be taken of Malham's testimony can it be said that he assumed a *duty* to build the warehouse. At most he had Farrell's oral permission to enter the land and erect the warehouse if he chose to do so. The essential element of a binding obligation is wholly lacking.

It is equally plain that, under our decisions, Farrell's conduct did not create an estoppel. In considering a similar situation in *Gunter* v. *Ludlam,* 155 Ark. 201, 244 S.W. 348, we held: ''There is no element of estoppel in the present case which would bar appellants from asserting the superiority of their [vendor's] lien. Mere knowledge on their part that labor and material were furnished for the construction of the building, or even their consent thereto, in the absence of some affirmative act which indicated a willingness to subordinate their claim to that of the subsequent lienors was not sufficient to operate as an estoppel.'' Accord: *Fine* v. *Dyke Bros.,* 175 Ark. 672, 300 S.W. 375, 58 A.L.R. 907.

Counsel also cite *McGehee Realty & Lbr. Co.* v. *Kennedy,* 200 Ark. 926, 141 S.W. 2d 524. There we allowed the liens because we found that the owner of the lot had given it to his son, who contracted for the construction of a house upon the property. Thus the land was lienable, for the son had ownership rather than mere possession. See *Mansfield Lbr. Co.* v. *Gravette,* 177 Ark. 31, 5 S.W. 2d 726. In the case at bar Malham's vague testimony did include an assertion that in the preliminary discussions Farrell promised to give him the lots, but a finding that a gift actually took place would be contrary not only to Malham's own testimony but also to many convincing facts and circumstances in the record.

It is with reluctance that we affirm this decree. Farrell, as the owner of the lots, is alone in being in a position to bid in the property without having to substantially destroy the value of the warehouse by removing it from the land. It appears that he is using his advantage to reap a windfall at the expense of the appellants. All that can be said is that his conduct is within his strict legal rights.

There are two motions for costs. The appellants designated an abbreviated record and submitted a short printed abstract. The appellees required that the whole record be brought up and a filed a supplemental abstract of 418 printed pages. The appellants ask reimbursement for the additional record. The appellees counter with a similar request for the cost of the supplemental abstract. We grant the appellants' motion to the extent that unnecessary pleadings were designated at a cost of $284.40. In other respects both motions are meritorious in part only. Neither side attempts to point out the exact extent to which the added expense was unnecessary. We do not consider it to be our duty to sift the complete record and the supplemental abstract to determine just what additional costs might be allowed to each side.

Affirmed.

McFADDIN, J., dissents.

ED. F. McFADDIN, Associate Justice (dissenting). I cannot bring myself to vote to affirm this case because I am thoroughly convinced that a great injustice is being done, and that Mr. Farrell is being allowed to unjustly enrich himself at the expense of the appellants. The equity courts came into existence to relieve against the rigors and/or injustices of the law; and this case comes to us on appeal from an equity court. I think it is our duty to mold a remedy for these appellants to prevent Mr. Farrell from unjustly enriching himself at their

expense. I like this language from the Supreme Court of Florida:[1]

"Its first maxim is that equity will not suffer a right to be without a remedy. . . . In a changing world marked by the ebb and flow of social and economic shifts, new conditions constantly arise which make it necessary, that no right be without a remedy, to extend the old and tried remedies. It is the function of courts to do this. It may be done by working old fields, but, when it becomes necessary, they should not hesitate to 'break new ground' to do so."

Our Court spoke out in like manner in *Renn* v. *Renn*, 207 Ark. 147, 179 S. W. 2d 657, wherein we said:
". . . equity must always be as astute in preventing fraud as corrupt minds are in conceiving it. A court of conscience must keep the granted relief abreast of the current forms of iniquity. We would never naively refuse relief against fraud simply because there is no similar instance of such fraud in the books."

I am willing to "break new ground" to prevent Mr. Farrell from being unjustly enriched at the expense of these appellants. The Majority Opinion recognizes that affirmance is unjust, when it says:

"It is with reluctance that we affirm this decree. Farrell, as the owner of the lots, is alone in being in a position to bid in the property without having to substantially destroy the value of the warehouse by removing it from the land. It appears that he is using his advantage to reap a windfall at the expense of the appellants. All that can be said is that his conduct is within his strict legal rights."

I would build an estoppel against Mr. Farrell and not permit him to be heard to say that he had not given— or leased for a long number of years—the land to Malham on which the warehouse was situated. Heretofore we have molded the remedy to grant relief when the

---

[1] *State ex rel, Watkins* v. *Fernandez*, 106 Fla. 779, 143 So. 638, A.L.R. 240.

equities demanded it. *Quality Excelsior Coal Co.* v. *Reeves*, 206 Ark. 713, 177 S. W. 2d 827. I think the same thing should apply here. We could at least require that Farrell would receive a reasonable annual rent, for the use of the land on which the building was situated, for a period of ten years. That would be somewhat in line with the cited case that we have mentioned above.

In *Keylon* v. *Arnold*, 213 Ark. 130, 209 S. W. 2d 459, a son refused to care for his mother in her declining years and, remaining silent, knowingly allowed her to convey the land to the appellee for the purpose of caring for the lady. We held that the son by his silence created an equitable estoppel against himself and that he could not, after his mother's death and after appellee had fully performed the contract, be heard to assert that he (the son) owned the land; and we said in that case:

"It is well settled that equitable estoppel may arise by silence or inaction. In 19 Am. Jur. 661 this appears: 'An estoppel may arise under certain circumstances from silence or inaction as well as from words or actions. Estoppel by silence or inaction is often referred to as estoppel by "standing by", and that phrase in this connection has almost lost its primary significance of actual presence or participation in the transaction and generally covers any silence where there are a knowledge and a duty to make a disclosure. The principle underlying such estoppels is embodied in the maxim "one who is silent when he ought to speak will not be heard to speak when he ought to be silent".'

"*Trapnall* v. *Burton*, 24 Ark. 371, is an opinion prepared by Albert Pike. In that opinion there is this classic language: 'If a person who has the claim to, or is the owner of property real or personal, stands by and permits it to be sold, without giving notice of or asserting his right, he is estopped from setting up his claim or title, against the purchaser. *Shall* v. *Biscoe*, 18 Ark. 142; *Corbett* v. *Norcross*, 35 N.H. 99; *Storrs* v. *Barker*, 6 C.J.R. 344. "There is no principle," said Chancellor

Kent, in *Wendell* v. *Van Renssalaer,* 1 J.C.R. 354, "better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man, knowlingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice; and his conscience is bound by this equitable estoppel".' "

In *Keylon* v. *Arnold,* a person who claimed the land sat still and remained silent; and we held that he was estopped to later assert his claim after he had seen others in good faith act on the assumption that the person with whom the others were dealing was the actual owner of the land. I think that principle applies here. The Majority Opinion says that to reach such conclusion we would be doing violence to a number of our cases, some of which are: *Hawkins* v. *Faubel,* 182 Ark. 304, 31 S. W. 2d 401; *Gunter* v. *Ludlam,* 155 Ark. 201, 244 S. W. 348; and *Fine* v. *Dyke Bros.,* 175 Ark. 672, 300 S. W. 375, 58 A.L.R. 907. But I distinguish the case at bar from those cases because there are facts here present which show that Mr. Farrell *was in bad faith* in letting these materialmen furnish the material. Here are portions of Farrell's own testimony regarding his conduct with Malham:

"Q. Well, did he talk to you about putting a building on your property?

"A. He mentioned it in conversations. . . .

"Q. Did you tell him he could not build on your property?

"A. No, sir; I never did tell him not to build.

"Q. Well, did you give him permission to build?

"A. No, sir; I never gave him permission to build.

"Q. Well, what did you do when you noticed construction was proceeding on your property?

"A. I called my attorney, Mr. James Sharp, and had him come down to my office, and asked him what to do.

"A. All right, sir.

"Q. We thought about going down there and stopping him. But we figured this would entail a lawsuit or damages, because the boy was dreaming about a $50 thousand a month profit. . . .

"Q. Did you forbid him to build a building on that property?

"A. No, sir; I never told him not to build it.
. . .

"Q. Then the question asked you was what caused you to fear a lawsuit should you stop him from building on your property?

"A. Because he was so worked up, and was in trouble, and if anybody had stopped him at that time— especially me—he would have sued for future profits. . .

"Q. What factual basis did he have, or did you fear he had, against you?

"A. Nothing. Only he would have thought I would have been stopping him from making a lot of money.

"Q. And you took that position after seeking the advice of counsel.

"A. Yes, sir.

"Q. Can you be any more specific as to what caused you that fear, other than your thinking this man was dreaming?

"A. No, sir.

"Q. Did your attorney advance any other ground?

"A. Not that I remember.

"Q. That is a rather unusual basis for an attorney to render a legal opinion on, is it not?

A. Yes, sir. But I have forgotten what he said, if he said anything else.

"Q. But he did tell you not to touch that man; to let him alone Is that right?

"A. That's right.

. . .

"Q. Did you not see them pouring concrete at the site of that building?

"A. I saw them pouring concrete when the building was nearly finished.

. . .

"Q. All right. What did you tell him about going on with that building. Did you forbid him to go on with it?

"A. No, sir.

"Q. All right. What was the arrangement after he finished the building? He had it almost done, you said.

"A. We did not have any arrangement of any kind.

"Q. Did you have any understandingn at all?

"A. We had no understanding of any kind.

"Q. Were you going to let him use your property rent free?

"A. Yes, sir. We had no agreement about rent, lease, or the purchase of the property. And no money, or any amount of money was ever mentioned in any way.

"Q. Well, did you lead him to believe that after he got his project done you would let him use that property?

"A. Well, if he could have built the project I would have probably let him use it free.

"Q. Well, you led him to believe he could lease it there, didn't you? You weren't going to make him move it. were you?

"A. No, sir.

"Q. No, sir, what?

"A. I never said I would make him move it.

"Q. And you led him to believe you wouldn't make him move it, did you not?

"A. What is the question?

"Q.. I said you led him to believe you would not make him move his building after he got it built?

"A. Well, yes, sir."

To quote further from the testimony of Mr. Farrell would only tend to unduly prolong this dissent. I maintain that he is estopped to claim against these appellants. His testimony clearly established: (a) that Farrell allowed Malham to erect the building with the understanding that it would not have to be moved; and (b) that Farrell knew that materials were being furnished to build a $30,000.00 building on his land, and he never uttered a word of warning to the material furnishers or to Malham. I maintain that Mr. Farrell acted in bad faith. In *Trapnall* v. *Burton, supra,* Justice Albert Pike quoted Chancellor Kent: " '. . . if one man knowingly, though he does it passively, by looking on, suffers another to . . . expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person.' " That situation fits Mr. Farrell in the case at bar; and I maintain that on the basis of Mr. Farrell's conduct, equity should allow the purchaser of the building on the land to have the use of the land rent free for a sufficient period of time to amortize the cost of the building.

There is another significant fact in this case that should be mentioned; and it is that Mr. Farrell made a trade with the local laborers in the course of this litigation, the effect of which was, that if they lost their labor lien claims in this litigation he would pay them in full the amount of such claims. This was almost equiva-

lent to buying their silence. The result is that the local laborers are paid and the materialmen are defeated, and Farrell reaps a wonderful reward. In a case on an entirely unrelated factual situation, Judge John E. Miller said: "The facts here require the application of the principle that equity will not permit one to unjusttly enrich himself at the expense of another." (*E. L. Bruce Co.* v. *Bradley Lbr. Co.*, 79 F. Supp. 176.) I would not permit Farrell to unjustly enrich himself at the expense of these materialmen. I would distinguish the case at bar from our previously adjudicated cases on the basis of Mr. Farrell's bad faith, and I would hold that Mr. Farrell is in equity estopped from claiming the use and possession of the land on which this building is located for a period of years sufficient to allow the building to sell for a reasonable purchase price. I think that is equity. The old maxim is: "Equity will not suffer a wrong to be without a remedy." Mr. Farrell remained silent when he should have spoken, and he cannot now be heard to speak and claim that the building on the land must be removed at the time of the purchase. I would carve out a remedy in accordance with the facts, just as was done in the case of *Quality Excelsior Coal Co.* v. *Reeves,* 206 Ark. 713, 177 S.W. 2d 827.

For these reasons I dissent from the Majority Opinion, which affirms the Chancery decree and gives Farrell a windfall profit.

